## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JENNIFER ANN FEDOREK,           )
                                )
       Plaintiff                )
                                )
       vs.                      )
                                )    Civil Action No. 05-186 Erie
RONALD SNYDER and KEOKE CRAFT   )
                                )
       Defendants                )    **Jury Trial Demanded**

### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Keokee Craft respectfully submits the following Brief in Support of

Motion for Summary Judgment.

### Issue

Whether plaintiff, as a matter of law, has failed to present a genuine issue of
material fact that she exhausted her administrative remedies pursuant to 42 U.S.C.
§1997e(a) of the Prison Litigation Reform Act prior to filing her civil rights
action pursuant to 42 U.S.C. §1983 and that those remedies were not available to
her.

### Statement of Facts

**Procedural History**

On June 15, 2006 plaintiff Jennifer Ann Fedorek filed this pro se civil rights

action by filing a completed form approved by the Court in accordance with W.D.PA.LR 9.2.

Service of process was achieved on defendant Keokee Craft on February 13, 2006 and on

defendant Ronald Snyder on February 14, 2006.  Plaintiff's original complaint asserted

violations of the Eighth and Fourteenth Amendments to the United States Constitution, arising

out of events that occurred on May 14, 2005 at the Venango County Prison, located in Franklin,

Venango County, Pennsylvania (Appendix, p. 228, ¶¶I, III and IV.A.-B.)  At the time plaintiff

apparently had not yet been sentenced by the Venango County Court of Common Pleas. (Appendix, p. 227, ¶I)

On March 7, 2006 defendants filed a Motion to Dismiss and Strike, along with a supporting brief, asserting that plaintiff's assertion of a claim of money damages in a sum certain was in violation of W.D.PA.LR 8.1 and, therefore, it should be stricken. Defendants contended in the same motion that the claim asserted against defendant Snyder should be dismissed because plaintiff's complaint did not allege his personal involvement in the alleged violations of plaintiff's Constitutional rights.

Before the Motion to Dismiss and Strike was decided, on March 20, 2006 plaintiff filed a document entitled "Memo," with a form completed in accordance with W.D.PA.LR 9.2 attached to it. The Memo appeared to be a brief in opposition to defendants' Motion to Dismiss and Strike and the attached form appeared to be intended as an amended complaint, designed to address defendants' objection to the claim against defendant Snyder. This amended complaint was filed without plaintiff seeking leave of court or the consent of defendants to her filing an amended complaint pursuant to Fed.R.Civ.P. 15(a). However, on April 4, 2006 defendants filed their Motion to Dismiss with respect to the amended complaint, paragraph 10 thereof containing defendant's written consent pursuant to Rule 15(a) to plaintiff filing her amended complaint.

On May 2, 2006 plaintiff filed what appeared to be a brief in opposition to defendant Snyder's April 4, 2006 Motion to Dismiss. On October 27, 2006 Chief United States Magistrate Judge Susan Paradise Baxter filed a report and recommendation, recommending that the court grant the defendant's motion to dismiss and strike finding that plaintiff had not made any allegations or statements that defendant Snyder was in any way personally involved in the alleged use of excessive force by defendant Craft. In addition, Judge Baxter recommended that

2

plaintiff's allegations against defendant Snyder did not constitute violations of her Eighth and Fourteenth Amendment rights.  On November 21, 2006 United States District Judge Sean J. McLaughlin approved Judge Baxter's report and recommendation over the objection to that report by the plaintiff, which effectively dismissed defendant Snyder from this action and preserved the action as against defendant Craft.

**Plaintiff's Complaint**

Plaintiff asserts that as of May 14, 2005 she had been placed "in segregation" in the Venango County Prison and that no reason for that placement was stated to her.  On that date defendant Craft placed her in handcuffs and escorted her from "segregation" to the visitor area of the Venango County Prison ("VCP") to see a visitor; placing plaintiff in handcuffs to make this trip was inconsistent with the policy of VCP.  During the trip defendant Craft yelled at plaintiff, insisted she wear the handcuffs during the visit and, at various points in time, "yank[ed]" on the handcuffs, "pinched the back of [plaintiff's] arm" and "threw [plaintiff] into the receiving desk."  Defendant Craft then refused to allow plaintiff to attend the visit and placed plaintiff in her cell with the handcuffs still on, telling plaintiff she would remove the handcuffs "when she felt like it."  As a result, there was swelling and there were bruises on plaintiff's wrists.  (Appendix, pp. 228-229, ¶IV.C)

Two other corrections officers thereafter came to plaintiff's cell and removed the handcuffs.  An investigation into the incident was conducted by the Venango County Sheriff's office and plaintiff filed an inmate grievance.  Thereafter plaintiff was retaliated against for complaining about these events: other prisoners were instructed not to speak with her and, apparently, they obeyed.  (Appendix, pp. 228-229, ¶IV.C)  Plaintiff's allegations against

3

defendant Craft stated that she "used unnecessary force [and] created her own procedure in the prison." (Appendix, pp. 228-229, ¶IV.C)

**Plaintiff's Testimony**

Jennifer Fedorek received weekly visits from her mother at VCP since her incarceration on December 4, 2004. (Appendix, pp. 12-13) May 14, 2005 was no different for the plaintiff. At approximately 6:00 p.m., Corrections Officer Keokee Craft came to Ms. Fedorek to prepare her for the visit. (Appendix, p. 32) When Craft came to get Fedorek out of her cell Craft had gone around the "receiving desk" through a door after which she said, "Fedorek, get ready for your visit." Fedorek indicated that she was ready. (Appendix, p. 34) In order for Craft to open Fedorek's holding cell door, she had to go into the control room and unlock the door. Craft did this herself because the VCP was short-staffed that evening. (Appendix, p. 43)

Craft emerged from the control room and walked around to the front of the receiving desk area and asked Fedorek to come to the desk; Craft got her handcuffs out to handcuff Fedorek. Fedorek left her cell and approached the desk with her hands out to be handcuffed. (Appendix, p. 43) As Fedorek approached Craft she told her that she "didn't have to wear these handcuffs" and that she was "told by another correctional officer on first shift that [she] wasn't to be wearing them." (Appendix, p. 45) Craft told Fedorek that she "had to wear them to [her] visit, and that [she] would have to take it up with the Officer in Charge ("OIC") if [she] had a problem with it." (Appendix, pp. 45-46) Fedorek complied with Craft and was handcuffed with her hands in front of her body.

Fedorek was concerned about wearing handcuffs to visitation for safety reasons. (Appendix, pp. 49-50) Other correctional officers had told Fedorek that inmates were not "to

visit" with the "general population [when they] were handcuffed because [inmates] could be attacked by somebody who wasn't handcuffed." (Appendix, p. 49) Craft and Fedorek then proceeded from Cell 2 of H Block past the reception desk, past the vestibule, then toward the men's work release area. They then turned the corner and walked toward the elevator. As they approached the elevator they ran into Corrections Officer Douglas Buchanan, the OIC for that duty shift. (Appendix, p. 51)

Fedorek stopped to talk with Buchanan while Craft had made it to the elevator and pushed the call button to summon it. Fedorek told Buchanan that another corrections officer had told her that she was not supposed to wear handcuffs during visitation. (Appendix, pp. 53-54) Buchanan told her that she had to wear the handcuffs. (Appendix, p. 54) As Fedorek stood there trying to talk to Buchanan, and as Craft was at the elevator, Craft was "yelling, Fedorek, get in the elevator, get in the elevator now." Then Craft walked over to Fedorek and told her that she was "not getting a visit," and she escorted Fedorek back to her cell with Officer Buchanan following behind. (Appendix, p. 55)

As Craft was escorting Fedorek back to her holding cell, Craft treated her "roughly." Craft pinched the back of her arms and pushed her. When she got her back to her cell, she placed her in her cell and left her there with her handcuffs on. (Appendix, p. 56) Fedorek then continued her conversation with Buchanan. He told Fedorek that she would have to wear the handcuffs during her visit. When Fedorek expressed concern for her safety, Buchanan replied, "this is where you're housed, you have to wear them. If she tells you you have to wear them, you have to wear them." (Appendix, p. 59) Fedorek testified that she had not been aware of any rule regarding handcuffs as she had not been provided with any information, including a handbook, which imposed any such restriction on her. (Appendix, pp. 59-60) After

5

Buchanan and Fedorek finished their conversation with respect to the handcuff issue, Buchanan radioed for Craft to return to the holding area and escort Fedorek to her visit. (Appendix, pp. 66-67)

Craft and Fedorek then resumed their trip to the elevator. Craft executed the escort in the same manner as the previous trip. (Appendix, p. 68) Craft held Fedorek in the "normal manner," and did not "exert too much force as she did that." She did not "push or shove [Fedorek] during that trip." (Appendix, p. 69) Craft and Fedorek entered the elevator. As the doors closed, Craft turned to Fedorek and said "what I was going to tell you was…" and Fedorek interrupted her, telling Craft, "[D]on't speak to me." Craft replied, "I am going to speak to you and you are going to listen." Fedorek replied, "[Y]ou can talk to me and I can hear you, but I am not going to listen to you." Then Craft "proceeded to put her hands on [Fedorek]." (Appendix, p. 70)

Craft pushed the emergency button to the elevator and it stopped in between floors. Craft then hit the button to return to holding cell area. As the doors opened to that level Craft ordered Fedorek to "get the fuck out of the elevator, that [she] wasn't getting a visit." (Appendix, pp. 72-73) When Fedorek protested, Craft radioed for backup. Fedorek testified that Craft grabbed her by the handcuffs, yanked her around and pushed her to the floor in the corner of the elevator. When the elevator descended and the doors opened, Officers Buchanan and Matthew Mason were standing at the door with mace cans in their hands. (Appendix, p. 74)

Mason and Craft physically removed Fedorek from the elevator. As they escorted Fedorek back to her cell for the second time, Craft was pinching Fedorek's arms which caused her to pull away from Craft. Craft was also pushing Fedorek along the way. (Appendix, p. 81) As they entered the receiving desk/holding cell area, Craft grabbed Fedorek by the shoulder area

6

on the back and pushed her to the right across the receiving desk, scraping her arm. Then Craft

placed her body over the top of Fedorek and held her there until someone opened the cell door.

(Appendix, pp. 83-84) Fedorek was put into the cell with the handcuffs still on her. She asked

Craft to remove the handcuffs and Craft responded that she would remove them when she felt

like it. She then left to continue bringing other inmates to their visitation. (Appendix, p. 111)

Five or ten minutes after Craft had left the area, Corrections Officers Bill

Struthers and Mason came to the cell and had Fedorek put her hands through the "pie hole" to

remove the handcuffs. She saw the prison physician, Dr. Beals, on May 16, 2005. She had x-

rays performed on her wrists which revealed no evidence of fractures. (Appendix, p. 108) She

was prescribed Tylenol and an ice pack. Ms. Fedorek testified that after the incident she was

unable to move her wrists for a while. She indicated that her arms were stiff and they hurt "real

bad to bend" because of the handcuffs. (Appendix, p. 110)

Fedorek prepared an Inmate Grievance on May 15, 2005. The substance of her

grievance was the following:

> "With an incident that occurred on 5-14-05. CO Craft used
> obscene language (CO Mason to wit) and unnecessary force (CO
> Mason, Struthers, Inmate Kizer to wit) on me. See also: Sheriff's
> report.
>
> I don't ever want to see her again. I wouldn't leave her alone in an
> elevator w/ an inmate but as far as others go…I think she needs
> training on how to handle situations as a CO not a police officer
> and some time off w/o pay to think about what she had done and to
> cool off wouldn't hurt." (Appendix, pp. 95-96)

She received the Inmate Grievance Response from Deputy Warden Michael

Sabousky on May 27, 2005, which states:

> "The Chief Deputy Warden or the Warden will look into the entire
> incident. Any action that may be taken will be the private
> concerns of the Venango County Prison and its management."

(Appendix, p. 97)  This meant to Fedorek that they were not going to do anything about it and they were not going to tell them anything about it.  In fact, Craft continued to work as if nothing had happened and there was no investigation.  (Appendix, p. 98)

**Verification of Keokee Craft**

Keokee Craft was born on July 28, 1971.  (Appendix, p. 134, ¶1)  She is presently employed by the Venango County Prison, a facility that secures individuals either awaiting adjudication of their charges, or serving a sentence in the prison.  (Appendix, p. 134, ¶2)  She has held that position from 2002 to the present.  (Appendix, p. 134, ¶3)  On May 14, 2005 she was assigned to work the night shift, also known as "C-Shift".  Corrections Officer Barb Andres and she were handling inmate visitation.  CO Andres would greet visitors and situate them in the visitation room while Craft would prepare the inmates and escort them to the visitation room.  (Appendix, p. 134, ¶4)

As a VCP corrections officer Ms. Craft has read and understood the policies and procedures contained in the Venango County Prison Employee Personnel Manual.  On page 47, under the heading entitled "Use of Force and Restraints", subheading "Restraints", the following language is stated in pertinent part:

> "Inmates in locked housing will be in restraints when moved out of their cells for any purpose;"

(Appendix, p. 134, ¶5, 221)  A "lockdown inmate" is an inmate who requires special accommodation because they cannot interact with other inmates without great difficulty or danger to themselves or other inmates.  Examples of such an inmate include the following: one inmate is enemies with another; the inmate is placed on suicide watch; the inmate has special medical needs.  (Appendix, p. 135, ¶6)

8

On May 14, 2005, at approximately 6:00 p.m., Craft began preparing Fedorek for her visitation. Being short-staffed that duty shift she had to physically enter the control room to activate the controls that released the lock to the cell door. Craft activated the door controls and Fedorek stepped out as Craft came back out from the control room and through the door to the receiving desk/holding cell area in H Block. (Appendix, p. 135, ¶7) Craft ordered Fedorek to place her hands out in order to handcuff her. Fedorek began to protest, stating that another corrections officer had told her that she did not have to wear handcuffs when being transported in the prison and especially during visitations. Craft explained the handcuff procedure. Fedorek then became loud and boisterous stating that her daughter was not going to see her with handcuffs on. As Craft placed the handcuffs on Fedorek, she attempted to reassure Fedorek that Craft would remove them when they reached the visitation room. (Appendix, p. 135, ¶8)

Craft and Fedorek began their first trip to the elevator that would take them to the level of the jail that housed the visitation room. Fedorek became more agitated as they approached the elevator. She continued to defy Craft, insisting that she did not have to wear the handcuffs. Craft again attempted to reassure her that she would not have to wear the handcuffs in front of her daughter but Fedorek refused to listen. Fedorek's verbal assault escalated with Fedorek screaming and yelling "Don't fucking talk to me!" At that point Craft was not going to let a disruptive inmate into the visitation area and she told Fedorek that she was not going to get her visit. (Appendix, p. 135, ¶9)

On their way to the elevator Craft and Fedorek ran into CO Buchanan, the OIC for C-Shift. Fedorek began to plead with Buchanan about the handcuffs and what she had allegedly heard from another corrections officer. Buchanan reiterated the handcuff policy to Fedorek and Craft told Buchanan that because Fedorek was disobeying Craft's orders she was

not going to get her visit.  Buchanan and Craft then escorted Fedorek back to H Block.
(Appendix, p. 136, ¶10)

Fedorek and Craft entered H Block while Buchanan had slipped behind the receiving desk via the control room.  Buchanan then proceeded to try to calm Fedorek down and reach some semblance of understanding with her.  Finally, Buchanan told Fedorek that if she wanted her visit she was going to have to wear the handcuffs.  Fedorek begrudgingly complied with this directive. (Appendix, p. 136, ¶11)  Before Craft and Fedorek departed for their second trip to the elevator, Craft stated to Buchanan that if Fedorek showed any sign of insubordination or disorderly conduct, Craft would revoke her visit again.  Although Fedorek stood there with nostrils flared and teeth clenched, it appeared to Craft that everyone was in agreement with that compromise.  Craft and Fedorek then began their second trip to the elevator.  (Appendix, p. 136, ¶12)

As Craft and Fedorek exited H Block, Craft attempted to explain to Fedorek that she intended to take the handcuffs off before Fedorek saw her daughter.  This set Fedorek off again.  Craft had just pressed the call button to summon the elevator.  The doors opened and Fedorek entered it.  Again, Fedorek was using profanities and yelling at Craft.  Craft then ordered Fedorek out of the elevator and informed her that she had lost her visit.  (Appendix, p. 136, ¶13)  Fedorek escalated her verbal assault screaming that she was going to get her visit. After arguing back and forth, Craft called for backup.  CO Mason was the first to respond.  He and Craft were able to remove Fedorek from the elevator without the use of physical force.  They then proceeded to escort Fedorek back to her holding cell.  (Appendix, p. 137, ¶14)

Normally a corrections officer is positioned slightly to the left and within arms length of an inmate when escorting him or her.  The officer does not put a hand on the inmate

10

unless it is absolutely necessary. Because Fedorek was agitated and resisting, Mason and Craft were on either side of Fedorek with a palm-open, light but firm hold on both of Fedorek's arms around the triceps area right above the elbow. At no time did Craft or Mason pinch Fedorek's arms, push her in the direction they were travelling or pull her along by the chain of her handcuffs. The only time they would increase their grip would be when Fedorek was struggling to break free. (Appendix, p. 137, ¶15)

Craft, Mason and Fedorek entered the receiving area and Mason departed Craft and Fedorek to open the holding cell door from the control room. Fedorek began to jerk away from Craft and was screaming and yelling. In order to subdue Fedorek, Craft placed one hand on her arm and another on her back gripping her shirt. Craft then guided, not pushed, Fedorek against the wall in between her holding cell and the adjacent cell. Craft did not shove or throw Fedorek against the wall. This was a controlled move that essentially was designed to immobilize rather than hurt Fedorek. (Appendix, p. 137, ¶16) The problem now was that in order for the holding cell door to completely open, Fedorek would have to be moved from where Craft had immobilized her. Fedorek continued to struggle with Craft. Craft then guided Fedorek to the receiving desk where she braced her against it in a standing position by continuing the hold she had on her arm and back but placing her knee in between her legs and resting it on the riser of the receiving desk. (Appendix, p. 137, ¶17)

These events occurred within a matter of seconds. Fedorek was not in the restraint move for very long before the holding cell door opened and Craft guided Fedorek into the holding cell. Because Fedorek continued to resist and scream, Craft left the handcuffs on until she calmed down. In order to diffuse the situation and because Craft had other inmate visits to complete, she left H Block and continued her duties. (Appendix, p. 138, ¶18) Before Craft

left the area, she informed either Mason or Buchanan that she would remove the handcuffs once Fedorek had calmed down. By the time Craft had returned, the handcuffs were already off Fedorek. After that Craft had no further contact with Fedorek the remainder of the evening. (Appendix, p. 138, ¶19)

**Verification of Michael Sabousky**

Michael Sabousky was born on January 21, 1948. (Appendix, p. 139, ¶1) He is presently employed by VCP as a corrections officer and has been from 1990 to the present. While he is a deputy warden at VCP he also serves as the Deputy Warden of Treatment. (Appendix, p. 139, ¶3) In his capacity as Deputy Warden of Treatment, Sabousky oversees inmate rehabilitative treatment programs such as Alcoholics Anonymous, Fatherhood, Early Headstart, etc. He also coordinates with the Drug and Alcoholic Department of Venango County and Turning Point, a program that grants inmates who have earned the privilege to leave the confines of the prison to complete a treatment program. (Appendix, p. 139, ¶4)

In his capacity as Deputy Warden, Sabousky oversees and processes inmate grievances. As a VCP corrections officer and deputy warden he has read and understands the inmate grievance procedures contained in the Venango County Inmate Handbook. Pages 17 through 19 of the Inmate Handbook contain a detailed description of the grievance procedure and the enumerated steps an inmate must complete. (Appendix, p. 140, ¶5, 160-162) Upon entry into VCP each inmate is given various documents which they are instructed to read. Among those documents is the VCP Inmate Handbook. The handbook is presented in a tote, which contains, among other things, bed linens, a care kit, and other personal items. The tote is stored in an inmate's holding cell. (Appendix, p. 140, ¶6)

Inmates are instructed to read and become familiar with VCP policies and procedures. The following language is contained on page 3 of the Inmate Handbook:

> "The purpose of this handbook is to provide you with the general rules and regulations that you are expected to follow while in the Venango County Prison (VCP). It is your responsibility to learn and abide by all rules and regulations of the Prison."

(Appendix, p. 140, ¶7, 146)  Additional copies of the Inmate Handbook can be found in the booking area and television room, these are common areas of the prison.  (Appendix, p. 140, ¶8) If an inmate fails to read the Inmate Handbook or loses their copy, a "staff member will instruct on the basic requirements for completing the form if the inmate so requests."  (Appendix, p. 140, ¶9; Appendix, p. 161)

On May 17, 2005 Sabousky received Fedorek's grievance which was signed by her and dated May 15, 2005.  The grievance was co-signed by CO Winters and Sgt. McKenzie. The grievance was inappropriately marked "standard" by Fedorek.  On May 27, 2005 Sabousky returned to Fedorek a copy of an Inmate Grievance Response, which was signed and dated by Sabousky, a true and correct copy of both documents is attached hereto as Fedorek Deposition Exhibit M.  (Appendix, p. 140, ¶10)  Sabousky reviews every inmate grievance and classifies it as either informal, standard or emergency.  He then answers the grievance and sends copies of his response to the inmate and the Warden.  It is not the inmate's prerogative to classify the grievance according to what he or she thinks it should be classified; this is indicated on the inmate grievance form and Ms. Fedorek's May 14, 2005 grievance, which states at the top of the page "Do not write in this Block."  (Appendix, p. 141, ¶11, 225)

Every Inmate Grievance Response that is returned to the inmate has three boxes marked "Step One", "Step Two", and "Step Three".  These boxes indicate which step of the

grievance process the inmate and the VCP are currently addressing.  In addition, this form contains the following language:

> "If you are not satisfied with the action taken at Steps One or Two, you may appeal this decision.  Step Three is with the Warden and his decision is final."

(Appendix, p. 141, ¶12, 226)  A typical grievance is classified either as informal or standard. Only in rare circumstances is a grievance classified as emergency.  An informal grievance is usually where an inmate is unhappy with something that happened within the prison and seeks a minor remedy (i.e., an inmate is harassing the aggrieved inmate).  A standard grievance contains a more detailed account containing allegations more serious in nature and a request for a very specific remedy.  (Appendix, p. 141, ¶13)

With respect to Fedorek's grievance, the incident description's casual tone and a lack of a specific remedy led Sabousky to classify her grievance as informal as opposed to standard.  (Appendix, p. 141, ¶14)  Finally, the language used in Sabousky's Inmate Grievance Response to Fedorek stating in part that "any action that may be taken will be the private concerns of the Venango County Prison and its management' meant that if there was any discipline to be implemented against CO Craft, Fedorek would not be privy to how that would have been dispensed, since it is not VCP policy to inform inmates on how corrections officer discipline is handled.  (Appendix, p. 142, ¶15)

14

## Argument

**Plaintiff, as a matter of law, has failed present a genuine issue of material fact that she exhausted her administrative remedies and that those remedies were not available to her. Under 42 U.S.C. §1997e(a) of the Prison Litigation Reform Act plaintiff was required to exhaust her administrative remedies prior to initiating a claim for damages under 42 U.S.C. §1983. This required plaintiff to exhaust the Venango County Prison's inmate grievance process prior to filing this action. In addition, the issuance of the Venango County Prison Inmate handbook upon entry to the prison, the extra copies available in the common areas of the prison, and the indication on the Inmate Grievance Form and Response clearly indicate that further steps in the prison's grievance procedure were available to her.**

The Prison Litigation Reform Act ("PLRA") was enacted to curb the sharp rise in prison litigation in the federal courts. Woodford v. Ngo, 126 S.Ct. 2378, 2382 (U.S. 2006). Contained within the PLRA is an exhaustion provision which states in pertinent part:

> "No action shall be brought with respect to prison conditions under §1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted.*" 42 U.S.C. §1997e(a) (2000).
> (emphasis added)

The failure to exhaust administrative remedies under the PLRA is an affirmative defense. Ray v. Kertes, 285 F.3d 287, 295 (3d Cir.2002). Exhaustion of all "available" remedies need not meet federal standards, nor must they be "plain, speedy, and effective." Porter v. Nussle, 534 U.S. 516, 524 (2002) (citing Booth v. Churner, 532 U.S. 731, 739-41 & n.5 (2001)). Whether a prisoner has "properly" exhausted a claim is determined by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances, and the waiver, if any, of such regulations by prison officials. Spruill v. Gillis, 372 F.3d 218 (3d Cir.2004). The exhaustion requirement of §1997e contains a procedural default component, which is governed by the applicable state prison grievance system, rather than by federal law. *Id.* at 230-31.

The VCP provides a three-step administrative procedure for handling inmate grievances. This procedure is enumerated on pages 17 through 19 of the *Venango County Prison Inmate Handbook*. The first step involves the inmate requesting a grievance form, filling out a description of the aggrieved event, and the type of relief the inmate is seeking. This grievance is forwarded to the Officer in Charge ("OIC"). The OIC may then attempt an informal resolution. If an informal resolution does not succeed within 48 hours of filing the grievance, the OIC will submit the grievance to the Deputy Warden of Treatment, here, Deputy Warden Sabousky. Deputy Warden Sabousky will then review the grievance and mark it as either informal, standard, or emergency. If the grievance is marked "informal", Sabousky will attempt to remedy the grievance within 7 days by talking to the inmate and attempting to resolve it. This would happen through a verbal agreement or through a written one where all remedies and dispositions are proposed. This written resolution is returned to the inmate within 30 days of receipt. This would be the same if the grievance was marked "standard". The only difference between informal and standard is the specificity of complained act and the proposed remedy.

Step two begins when step one is not resolved within 7 days to the inmate's satisfaction. If this occurs, a Grievance Committee convenes to resolve the issue. The inmate may appear before the Grievance Committee to present the case. After reviewing the case, the Grievance Committee will issue a decision within 5 business days. If the inmate is unsatisfied with the Grievance Committee's decision, he or she may, within 5 business days, file an appeal with the Warden. The Warden will then have 10 business days to review the appeal and reply to the inmate. The Warden's decision as to the inmate grievance will be final. Thus, this is the last administrative step the inmate must make before filing any type of civil action under the PLRA.

According to plaintiff's testimony, she completed the first step of the grievance process. She submitted the grievance which vaguely described the aggrieved conduct of CO Craft and gave an indefinite remedy in the form of suggesting that she didn't "ever want to see her again" and "[s]he needs training." Without more, Deputy Warden Sabousky classified the grievance as informal. It was clear from the Inmate Grievance Response that the plaintiff could have initiated steps two and three of the grievance procedure. This was indicated by the clearly delineated boxes at the top of the form and the language at the bottom of the section entitled "Action Taken". Clearly, plaintiff was required to exhaust these steps before she filed her §1983 claims in the present action. Therefore, because of the clearly delineated grievance procedure and indications on the grievance form and response of further steps, there exists no genuine issue of material fact that plaintiff exhausted her administrative remedies prior to bringing her civil rights action; thus, summary judgment should be entered in favor of defendant Craft.

The availability of administrative remedies to a prisoner is a question of law. Ray, *supra* at 291. "Even where the 'available' remedies would appear to be futile at providing the kind of remedy sought, the prisoner must exhaust the administrative remedies available. Once that is no longer the case, then there are 'no remedies…available' and the prisoner need not further pursue the grievance." Booth at 740. The determination of when an administrative remedy is still "available" depends on whether or not the inmate produces sufficient evidence of unavailability and whether or not the defense can satisfy its burden to disprove the contention of unavailability.

In determining availability of administrative remedies or, here, grievance procedures, one must ask the following: "would 'a similarly situated individual of ordinary firmness' have deemed them available." Hemphill v.State of New York, 380 F.3d 680, 688 (2d

17

Cir.2004). §1997e(a) says nothing about a prisoner's subjective beliefs, logical or otherwise, about the administrative remedies that might be available to him. Chelette v. Harris, 229 F.3d 684, 688 (8th Cir.2000). In Ruggiero v. County of Orange, 467 F.3d 170 (2d Cir.2006), Ruggiero claimed that he did not exhaust his administrative remedies because the inmate handbook was never provided to him and, thus, the defendants were estopped from asserting a failure to exhaust defense. The court outlined some examples where exhaustion may be excused: if the defendant's actions estop a prisoner from presenting the failure to exhaust as a defense; Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir.2004) or a prison's actions render grievance procedures de facto unavailable. Hemphill at 687. The court noted that although an issue of fact existed as to whether Ruggiero ever possessed the inmate handbook, nowhere was it alleged that Ruggiero was subject to any affirmative acts by prison officials that would have prevented him from pursuing the administrative remedies. Thus, the court held that there was no reason to justify an excuse for the inmate's failure to exhaust his administrative remedies.

Plaintiff's testimony indicates that she was unaware that she had to exhaust her administrative remedies or that she even knew those options were available to her. She equates this lack of knowledge to her claim that no one ever told her that there were further steps available to her or that these steps were laid out in the Inmate Handbook. However, the evidence and testimony indicate otherwise. Plaintiff testified that she has been incarcerated at the VCP on prior occasions. She also indicated that she has seen a copy of the Inmate Handbook having received a copy upon entry into VCP in 2002. (Appendix, p. 60) Even if Ms. Fedorek was unaware that the grievance procedure was outlined in the Inmate Handbook, the Inmate Grievance response indicates there were further steps to take and that she had a right to appeal Deputy Warden Sabousky's determination.

Furthermore, plaintiff has produced no evidence that would suggest the officials at VCP affirmatively or intentionally prevented her from seeking steps two and three of the grievance procedure. While she claims that no one assisted her on the basic requirements for filling out the grievance form, she also never asked anyone for that assistance. (Appendix, p. 102) When she discussed the topic with Deputy Warden Sabousky, she indicates that he told her that "they would take care of it and it was no longer her concern." (Appendix, pp. 99-100) This statement by Deputy Warden Sabousky refers to informing her that the implementation of discipline against defendant Craft would not be explained to her because inmates are never informed of how or if corrections officer discipline will be instituted.

Essentially, the grievance procedure was available to the plaintiff. As indicated *supra*, inmates are responsible for reading the information that is provided to them upon entry to VCP. Among that information is the Inmate Handbook which contains a detailed description of the grievance procedure. Even if it is believed that the plaintiff did not receive such a manual upon her latest stay at VCP, she could have picked up a community copy in the booking area or television viewing room. Also, there are clear indications on the Inmate Grievance Response that there were further steps she could have pursued and that she had a right to appeal Deputy Warden Sabousky's decision. The plaintiff's bald assertions that she didn't know these grievance procedures were in place are merely subjective beliefs with nothing substantial to support them. It is objectively clear that a similar inmate in a similar situation would have deemed the administrative remedies "available" for purposes of satisfying the exhaustion requirement of the PLRA. Therefore, the evidence shows no genuine issue of material fact that plaintiff could not exhaust her administrative remedies or that those remedies were unavailable to her. Thus, summary judgment should be entered in favor of defendant Craft.

Respectfully submitted,


/s/ *Daniel P. Marnen*
James T. Marnen
PA I.D. No. 15858
Daniel P. Marnen
PA I.D. No. 204806
MARNEN MIODUSZEWSKI
BORDONARO WAGNER & SINNOTT, LLC
516 West Tenth Street
Erie, PA  16502-1352
(814) 874-3460 Voice
(814) 874-3476 Fax
(814) 460-6979 Mobile
jmarnen@mmbwslaw.com
dmarnen@mmbwslaw.com

Attorneys for Defendant,
Keokee Craft

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JENNIFER ANN FEDOREK, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) Civil Action No. 05-186 Erie |
| RONALD SNYDER and KEOKE CRAFT | ) |
| | ) |
| Defendants | ) |
| | ) |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2007, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will not send notification of such filing

to the other party in this action, pro se plaintiff Jennifer Ann Fedorek, and I hereby certify that I

have mailed by United States Postal Service the document to the following non-CM/ECF

participant:  pro se plaintiff Jennifer Ann Fedorek.


/s/ *Daniel P. Marnen*
Daniel P. Marnen