## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JENNIFER ANN FEDOREK,           )
                                )
    Plaintiff                   )
                                )
    vs.                         )
                                ) Civil Action No. 05-186 Erie
RONALD SNYDER and KEOKE CRAFT   )
                                )
    Defendants                  ) **Jury Trial Demanded**

### APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

| PAGE | DESCRIPTION |
|------|-------------|
| 1. | Deposition of Jennifer Ann Fedorek taken on January 9, 2007. |
| 134. | Verification of Keokee Craft taken on October 24, 2007. |
| 139. | Verification of Michael Sabousky taken on October 23, 2007. |
| 143. | A copy of the Venago County Prison Inmate Handbook, marked as Fedorek Deposition Exhibit F. |
| 174. | A copy of the Venango County Prison Employee Personnel Manual, marked as Fedorek Deposition Exhibit G. |
| 225. | A copy of Jennifer Fedorek's 5-15-05 inmate grievance and Deputy Warden Sabousky's 5-27-05 Inmate Grievance Response, marked as Fedorek Deposition Exhibit M. |
| 227. | A copy of Jennifer Fedorek's June 15, 2005 complaint. |

Respectfully submitted,


/s/ Daniel P. Marnen
James T. Marnen
PA I.D. No. 15858
Daniel P. Marnen
PA I.D. No. 204806
MARNEN MIODUSZEWSKI
BORDONARO WAGNER & SINNOTT, LLC
516 West Tenth Street
Erie, PA 16502-1352
(814) 874-3460 Voice
(814) 874-3476 Fax
(814) 460-6979 Mobile
jmarnen@mmbwslaw.com
dmarnen@mmbwslaw.com

Attorneys for Defendant,
Keokee Craft

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JENNIFER ANN FEDOREK,                    )
                                         )
    Plaintiff                            )
                                         )
    vs.                                  )
                                         )    Civil Action No. 05-186 Erie
RONALD SNYDER and KEOKE CRAFT            )
                                         )
    Defendants                           )
                                         )

### CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will not send notification of such filing to the other party in this action, pro se plaintiff Jennifer Ann Fedorek, and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participant: pro se plaintiff Jennifer Ann Fedorek.

*/s/ Daniel P. Marnen*
Daniel P. Marnen

1                  IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2    JENNIFER ANN FEDOREK,          :
            Plaintiff               :
3                                   :
            v.                      :    Civil Action No. 05-186 Erie
4                                   :
     RONALD SNYDER and KEOKEE       :
5    CRAFT,                         :
            Defendants              :
6

7

8            Deposition of JENNIFER ANN FEDOREK, taken before

9    and by Sonya Hoffman, Notary Public in and for the

10   Commonwealth of Pennsylvania, on Tuesday, January 9,

11   2007, commencing at 8:55 a.m., at the offices of Knox

12   McLaughlin Gornall & Sennett, P.C., 120 West Tenth

13   Street, Erie, PA 16501.

14

15

16

17   For the Plaintiff:

18       Jennifer Ann Fedorek, Pro Se

19

20   For the Defendants:

21       James T. Marnen, Esquire
         Knox McLaughlin Gornall & Sennett, P.C.
22       120 West Tenth Street
         Erie, PA 16501
23

24

25              Reported by Sonya Hoffman
            Ferguson & Holdnack Reporting, Inc.

Appendix 01

1                          I N D E X

2

3

4   JENNIFER ANN FEDOREK

5        Direct Examination by Mr. Marnen . . . . . . . . 3

6

7

8

9

10                        E X H I B I T S

11

12   Defendant's Exhibit A. . . . . . . . . . . . . . 9

13   Defendant's Exhibit B. . . . . . . . . . . . . .12

14   Defendant's Exhibit C. . . . . . . . . . . . . .13

15   Defendant's Exhibit D. . . . . . . . . . . . . .33

16   Defendant's Exhibit E. . . . . . . . . . . . . .36

17   Defendant's Exhibit F. . . . . . . . . . . . . .60

18   Defendant's Exhibit G. . . . . . . . . . . . . .63

19   Defendant's Exhibit H. . . . . . . . . . . . . .86

20   Defendant's Exhibit I. . . . . . . . . . . . . .87

21   Defendant's Exhibit J. . . . . . . . . . . . . .88

22   Defendant's Exhibit K. . . . . . . . . . . . . .90

23   Defendant's Exhibit L. . . . . . . . . . . . . .92

24   Defendant's Exhibit M. . . . . . . . . . . . . .93

25

1        J E N N I F E R  A N N  F E D O R E K, first

2        having been duly sworn, testified as follows:

3

4                        DIRECT EXAMINATION

5    BY MR. MARNEN:

6

7        Q.    Would you mind stating your full name.

8        A.    Jennifer Ann Fedorek.

9        Q.    And your date of birth.

10       A.    9/5/78.

11       Q.    Okay.  This is a deposition, I just want to

12   explain to you a little bit what it's about.  The purpose of

13   the deposition is for me to ask you questions and find out

14   what your version of the events is that are in question.

15            You have a right to hear me and understand me, so

16   if you don't hear me or if you don't understand me, please

17   tell me and I'll try again.  When you answer my questions,

18   please use words because she has trouble with gestures.  If

19   you just nod your head or something, she then has to figure

20   out what you mean.  So use words.  And try not to use

21   sounds --

22       A.    Uh-huh.

23       Q.    -- like uh-huh, as you did, because she has to

24   interpret that too.

25       A.    Okay.

1    Q.   So I'll try to use words and you try to use words,

2    and we'll be okay.  And the other thing we've got to

3    remember is not to talk at the same time.

4    A.   Okay.

5    Q.   Any time you want to take a break, you can, but I

6    don't think this is going to take very long.

7    A.   Okay.

8    Q.   All right.  Where do you presently reside?

9    A.   I reside at Gaudenzia-Crossroads.

10   Q.   How do you spell Gaudenzia?

11   A.   G-A-U-D-E-N-Z-I-A.

12   Q.   Crossroads.

13   A.   Yes.

14   Q.   Where is that located?

15   A.   At 414 West 5th Street.

16   Q.   5th Street, in Erie?

17   A.   Yes.

18   Q.   And prior to that, where did you reside?

19   A.   Prior to that, I lived at Cambridge Springs -- SCI

20   Cambridge Springs.

21   Q.   SCI, meaning State Correctional Institution?

22   A.   Correct.

23   Q.   All right.  And when did you leave Cambridge

24   Springs?

25   A.   November 27, 2006.

1    Q.    Have you been at Gaudenzia-Crossroads ever since?

2    A.    Yes.

3    Q.    And when did you enter Cambridge Springs?

4    A.    I'm not sure of the month.  Let me think.  It

5    would have been November of 2005.

6    Q.    So you were there about one year.

7    A.    Yes.

8    Q.    And as I understand, you were sentenced for

9    something to go there.

10    A.    That's correct.

11    Q.    What were you sentenced for?

12    A.    There were several charges, but it was theft,

13    general -- categorized as theft, general.  Theft by

14    deception, conspiracy to commit forgery, and those were my

15    State sentences.

16    Q.    And the sentence related to all three of those.

17    A.    My sentence was run consecutive, so I was given

18    one sentence, which was two and a half to seven years.

19    Q.    Who was the judge?

20    A.    Judge Lobaugh.

21    Q.    And was that all one event that gave rise to those

22    charges?

23    A.    No.  One was a parole violation.  And the other

24    two were separate incidents, but they were all categorized

25    in general theft.

1    Q.    And what was involved in the theft?

2    A.    Checks that did not belong to me.

3    Q.    What were the amounts involved?

4    A.    The first one was a violation from 2002, I

5    believe, and the amount of that was $7,000.  And the second

6    one -- well, with them grouped together, it totaled another

7    $7,000.

8    Q.    Prior to being -- did you plead guilty or have a

9    trial and get convicted?

10    A.    I pled.  The first time, I had a trial and was

11    found convicted.  And with the parole violation -- because I

12    had already served that sentence.  With the parole violation

13    and the new charges, I pled guilty.  That we're talking

14    about now, yes, I pled guilty to.

15    Q.    Okay.  The one concerning which you had the parole

16    violation, was that your first conviction?

17    A.    Yes.

18    Q.    Have we now covered all your convictions, then?

19    A.    Yes.

20    Q.    And are you now presently on parole?

21    A.    I'm still an inmate.  I'm on prerelease, so I'm

22    still considered incarcerated.

23    Q.    Are you working?

24    A.    Yes.

25    Q.    What are you doing?

1    A.    Telemarketing.

2    Q.    Have you been doing that since you got out of

3    Cambridge Springs?

4    A.    No.  I've just gotten the job, but I've been on

5    work release.

6    Q.    Do you do that at Gaudenzia or do you do that

7    somewhere --

8    A.    No.

9    Q.    -- you're talking at the same time as I am.

10    A.    Sorry.  I apologize.

11    Q.    That's all right.

12    A.    No, I have separate employment.  That's just

13    residential living.  It's transitional living, so I just

14    reside there.

15    Q.    Who is your employer?

16    A.    United Air Temp.

17    Q.    United Air Temp.

18    A.    Yes.

19    Q.    Are they in Erie?

20    A.    Yes.

21    Q.    So right now you are -- you're 28 years old.

22    A.    That's correct.

23    Q.    Are you a high school graduate?

24    A.    Yes.

25    Q.    What year did you graduate?

1    A.    1996.

2    Q.    Where from?

3    A.    Oil City Senior High School.

4    Q.    And have you had any formal education since then?

5    A.    Yes.

6    Q.    What have you had?

7    A.    Well, I also have a diploma in data processing,

8    which I graduated in 1996 for.

9    Q.    Yes.

10    A.    I attended the University of Pitt. at Titusville

11    for two years studying physical therapy assistant.  I took a

12    year of general studies at the University of Clarion,

13    Venango campus.  And I took two years at DuBois Business

14    College, Oil City campus for administrative medical

15    assistant, which I will be graduating in September of this

16    year.

17    Q.    Did you get a degree from Pitt.?

18    A.    No.

19    Q.    So the physical therapy assistant course, you

20    didn't complete that.

21    A.    That's correct.

22    Q.    And the one year you did in Clarion at the Venango

23    County campus, did you complete that?

24    A.    Just general studies, so there's no degree.

25    Q.    There's no degree, you weren't shooting for

```
 1   anything.

 2        A.    No.

 3        Q.    Are you married?

 4        A.    No.

 5        Q.    Do you have any children?

 6        A.    One.

 7        Q.    And is it a boy or a girl?

 8        A.    Girl.

 9        Q.    What is her age?

10        A.    Two and a half.

11        Q.    What's her date of birth?

12        A.    6/11/04.

13        Q.    What is her name?

14        A.    Hannah Hutchinson.

15        Q.    H-A-N-N-A-H?

16        A.    That's correct.

17        Q.    Hutchinson, H-U-T-C-H-I-N-S-O-N?

18        A.    That's correct.

19        Q.    Where does she reside?

20        A.    She resides with her grandmother.

21        Q.    Is that your mother?

22        A.    That's correct.

23        Q.    What's your mother's name?

24        A.    Patricia Fedorek.

25              (Defendant's Exhibit A marked for identification.)
```

1     Q.   I want to show you a copy of what I think is your

2   Amended Complaint, but I'd like you to identify it, if you

3   can.   I'm marking it as Defendant's Exhibit A.

4     A.   (Witness reviews document.)

5     Q.   And we may have here, Jennifer, a couple of

6   documents that are attached together, but I copied the six

7   pages that were filed at one time on March 30, 2006.

8     A.   Yes, that's it.

9     Q.   The very first page is entitled "Memo," correct?

10     A.   Correct.

11     Q.   Is that in your handwriting?

12     A.   Yes.

13     Q.   And then the second and third pages are comprised

14   of a form from the court; is that correct?

15     A.   That's correct.

16     Q.   And that's all filled out in your handwriting.

17     A.   That's correct.

18     Q.   And then it follows, the next document is

19   something in handwriting and the title of it is

20   "Attachment."

21     A.   Correct.

22     Q.   And that was also prepared by you.

23     A.   Correct.

24     Q.   And I guess we get into a form again.

25     A.   Correct.

1    Q.   That is signed by you.

2    A.   Correct.

3    Q.   And then this last page is the Certificate of

4  Service that you also signed, correct?

5    A.   Correct.

6    Q.   And the very last page is a copy of an envelope.

7  And it would appear to be an envelope in which the pages

8  that are preceding that were enclosed when they were sent to

9  the court.

10   A.   Correct.

11   Q.   Okay.  If you would go to -- notice at the top of

12  each one of those pages it says, Page 1 of 6, 2 of 6, et

13  cetera.  Do you see that?

14   A.   Yes.

15   Q.   Okay.  If we go to Page No. 2, please.

16   A.   (Witness complies.)

17   Q.   And it would appear from that document that you

18  are confined at Cambridge Springs when you prepared this.

19   A.   Correct.

20   Q.   And you had been sentenced at that time to 27 to

21  84 months, correct?

22   A.   Correct.

23   Q.   But as I understand it, at the time of the

24  incident, which is this subject of this case, you had not

25  been sentenced, correct?

1      A.    That's correct.

2      Q.    If you turn to Page No. 4, the very first sentence

3  reads, "Plaintiff asserts that as of May 14, 2005, I had

4  been housed in areas of the Venango County Prison ("VCP")

5  that were unordinary for an inmate to be housed in."  That's

6  the date of the incident in question, May 14th.

7      A.    That's correct.

8      Q.    And at that time you were a pretrial detainee.

9      A.    Correct.

10     Q.    And just to help you out, maybe, with some dates,

11 do you remember when you entered the Venango County Prison?

12     A.    December 4, 2004.

13           (Defendant's Exhibit B marked for identification.)

14     Q.    I thought you might remember that.  I remember the

15 day I was drafted, too, you never forget those things.  Let

16 me show what I'm going to mark as Defendant's Exhibit B and

17 that is -- the first page is a document that's entitled

18 "Venango County Prison Initial Commitment Screening."

19           That's a document that I produced to you in the

20 course of this lawsuit, correct?

21     A.    Correct.

22     Q.    Did you ever see it, though, before I gave it to

23 you in this lawsuit?

24     A.    Not this one, but I've seen these before as I was

25 standing there as it was filled out.

1      Q.    Okay.   They don't give you a copy of it when you

2   enter.

3      A.    You don't get copies of anything.

4      Q.    Right.   But that does indicate the date and year

5   of your initial commitment was December 4, 2004.

6      A.    That's correct.

7      Q.    And you were committed on that date regarding the

8   charges for which you were eventually sentenced.

9      A.    Yes.

10     Q.    Do you remember the day you were sentenced, the

11   date you remember being sentenced?

12     A.    No.

13     Q.    Can you approximate it?

14     A.    It was July sometime.

15     Q.    July of '05?

16     A.    Yes.

17     Q.    So July of the same year of which the May 14th

18   incident occurred?

19     A.    Yes.

20           (Defendant's Exhibit C marked for identification.)

21     Q.    Let me show you now what I'm going to mark as

22   Defendant's Exhibit C.   And I'll represent to you that this

23   is another document that I gave to you in the course of

24   discovery in this case, and you may recognize it.   Do you

25   recognize that as a document that I produced to you?

1    A.    Yes, I do.

2    Q.    Is that a document that you ever saw prior to the

3    time I produced it to you?

4    A.    No.

5    Q.    If you look, it appears to go chronologically from

6    bottom to top.

7    A.    Uh-huh -- yes.

8    Q.    And see the first column is headed, Section, and

9    then it goes across, Block, Cell, Bed, Jail Location, Date,

10   Time Moved Here, Date Time Vacated, Reason for Moving Inmate

11   Here, right?

12   A.    Yes.

13   Q.    Under Section, the very first entry that is last

14   on the list but, I think, chronologically it's the first, it

15   says, "W Storeroom."  Do you see that?

16   A.    Yes.

17   Q.    What does that mean; do you know?

18   A.    That means that they were overcrowded and they put

19   me in a storeroom because they had nowhere else to house me.

20   Q.    So on December 4, 2004, you were housed in a

21   storeroom in -- what does W mean?

22   A.    That means that it was in the block.  It wasn't a

23   holding cell.  It was in the general area where the women

24   are housed within Venango County Prison.

25   Q.    So W stands for women.

1      A.    It stands for W Block.

2      Q.    Does that stand for women?

3      A.    No.

4      Q.    Just W.

5      A.    It's just a letter of the alphabet that they use.

6      Q.    And so if you go to the next item over, under

7   Block, it does say W; doesn't it?

8      A.    Yes.

9      Q.    And you were in Cell A.

10      A.    Yes.

11      Q.    And Bed 4.

12      A.    Yes.  But there wasn't a bed, it was a cot.  So I

13   don't know where the number 4 would have came from.

14      Q.    Were there any other inmates in there with you?

15      A.    Oh, yes.

16      Q.    More than four?

17      A.    Yes.

18      Q.    Okay.

19      A.    That I recall.

20      Q.    When you were in there, did you know it was called

21   Cell A or is this news to you now?

22      A.    It's news to me now.

23      Q.    But you did know you were in W block?

24      A.    Yes.

25      Q.    And you certainly knew it was a storeroom, right?

1      A.    Yes.

2      Q.    And the Jail Location is Main.   Is that the --

3 what does that mean; do you know?

4      A.    I don't know.   I'm going to guess that it means --

5 Main just means Venango County Prison, because it says that

6 on all of these, if you notice.

7      Q.    I do notice that.   And Date and Time Moved Here,

8 it says 12/4/2004, 21:24, right?

9      A.    That's correct.

10     Q.    So 21:24, that's military time, that's 9:24 p.m.

11     A.    That's correct.

12     Q.    So you checked in on that date and that time; is

13 that accurate?

14     A.    I checked into that storeroom at that time, it

15 would be accurate, not into the jail.

16     Q.    I got you.   Okay.   Right.   And it indicates for

17 the next column that you vacated that area on December 11,

18 2004.

19     A.    That's correct.

20     Q.    Does that jive with your memory?   Were you there

21 about a week?

22     A.    Yes.

23     Q.    Do you remember if it was exactly December 11th?

24     A.    I don't remember if it was exactly that date.

25     Q.    But it was about a week?

1        A.    That's correct.

2        Q.    And then it would -- according to this document,

3    you were then in Section W Lower.  Does that mean anything

4    to you?

5        A.    That means -- there's two tiers, there's a top

6    tier and a bottom tier.  So the lower would be the bottom

7    tier, the first floor.  The storeroom would have been

8    located on the second floor.

9        Q.    And W Upper would be on the second floor, too?

10       A.    That's correct.

11       Q.    So you're in the same block at that point, W

12    Block, right?

13       A.    General population of women, that's correct.

14       Q.    And according to this, you stayed there from

15    December 11, 2004 to January 21, 2005, right?

16       A.    Yes.  I was in a cell, Cell 153, Bed B.

17       Q.    That time period, is that about right?

18       A.    It's correct.

19       Q.    Okay.  And then you vacated that on January 21 and

20    went to the Holding Section in H Block, right?

21       A.    That's correct.

22       Q.    And that also jives with your memory?

23       A.    That's correct.

24       Q.    And you were there for about a week?

25       A.    I didn't think I was there that long, but if --

1  you have to see the psych. doctor when you go on suicide

2  watch, so -- and they only come in weekly.  So it was

3  probably about a week.

4      Q.   And it does say reason for moving inmate here is

5  suicide watch, correct?

6      A.   That's correct.

7      Q.   Had you made a comment that you were thinking

8  about it or something like that?

9      A.   It was more or less made out to be a joke, because

10 I knew that I would be removed from the block that I was on,

11 which was W block, if I told them that I was going to kill

12 myself.  So that's what I did in order to be moved at that

13 time.

14     Q.   You were there about a week.  And did you see a

15 doctor during that time?

16     A.   I finally seen a doctor, yes.

17     Q.   And then on the 28th, according to this document,

18 you went to, it says, Other for Section, and it's Other for

19 Block.  Do you know what that means?

20     A.   I don't know why.  It says here at the end if you

21 look under Reason for Moving Housing, Cell 122 not available

22 in computer.  So apparently this is a Venango County

23 computer glitch because if you look at the following one,

24 Room 122 would be C Block, which is where I was moved to,

25 which would be what they call the Hole.

1      Q.   What they call the what, the Hole?

2      A.   Yes.

3      Q.   H-O-L-E?

4      A.   Yes.

5      Q.   And why were you moved there?

6      A.   I have no idea.

7      Q.   Is that isolation?

8      A.   It's lockdown, 24/7, you're never allowed out of

9  your cell.

10     Q.   Did you have a cellmate?

11     A.   Yes, I did.

12     Q.   And who was your cellmate?

13     A.   Jennifer McMunn, at one point.  I believe my first

14  roommate may have been Sharon Pascorell.

15     Q.   How do you spell McMunn; do you know?

16     A.   M-C-M-U-N-N.

17     Q.   And then the other was, what, Sharon?

18     A.   Sharon.

19     Q.   Pascorell?

20     A.   P-A-S-C-O-R-E-L-L.  And I'm not sure if I had any

21  other roommates or not.  I believe those were the only two.

22     Q.   Did you only have one roommate at a time?

23     A.   Yes.

24     Q.   And you were in the Hole for, according to this,

25  about five weeks.

1      A.   That's correct.  There was a lot of disorder

2    within the Venango County Prison and they had never, to my

3    knowledge, had any women in the Hole.  It's always been a

4    male lockdown.  And so -- and it's for maximum security

5    prisoners.  And so they moved them out of there and put a

6    lot of women in there.  And for some reason I was put in

7    there, I don't know for what reason, from suicide watch into

8    there.

9            And apparently the males were acting up again,

10   because they knew that the women had renovated (sic) their

11   areas, so they moved us again in order to put the males back

12   in there because they were bad.

13     Q.   And then, according to this document, you next

14   went to W Storeroom for, it says, one minute, on March 4,

15   2005.  What is that about; do you know?

16     A.   I don't know.  They may have just -- when they

17   were relocating people they had us just in general areas,

18   because they didn't know what rooms we were going to be

19   assigned to yet.  So I'm assuming, I'm not absolutely sure,

20   that that just meant that we were in transition to a room.

21     Q.   You don't remember, today, being in the storeroom

22   for one minute?

23     A.   No, not at all.

24     Q.   And then, according to this document, you were

25   next in W Lower, right?

1    A.    That's correct.

2    Q.    So W Block is comprised of two sessions, one is

3    lower and one is upper?

4    A.    That's correct.

5    Q.    And it says, Cell 153, Bed A, from March 4, '05 to

6    March 30, '05.

7    A.    Yes.

8    Q.    And someone has written to the right of there, and

9    I don't know who, "this is the time she left W Block to go

10   to Holding."

11   A.    Yes.

12   Q.    W Lower, is that Holding?

13   A.    No, it's not.  It's general population, just like

14   before.

15   Q.    I see.  The next entry is Holding, as you go up

16   the page.

17   A.    Yes.

18   Q.    And is W Lower general population?

19   A.    Yes, it is.

20   Q.    And then on March 30, 2005, according to this

21   document, you went to Holding; is that correct?

22   A.    That's correct.

23   Q.    And you remained in Holding, according to this

24   document, until May 30, 2005.

25   A.    That's correct.

1      Q.   So is it your memory that you were there for about

2   two months?

3      A.   It seemed longer.  I don't know if that's exactly

4   correct.

5      Q.   But it was multiple months?

6      A.   Yes.

7      Q.   And at the time of May 14, 2005, you were living

8   there?

9      A.   That's correct.

10     Q.   And do you know why you went into Block H, Section

11  Holding on March 30, '05?

12     A.   I repeatedly asked Warden Snyder and the

13  correctional officers why I was housed there, and I was

14  given no reply.  I did not have any misconducts at that

15  time.  I wasn't there for behavioral, I wasn't there for

16  suicide.  I eliminated all the options that I could have

17  possibly been placed there for.  And I didn't have any

18  enemies on the Block at that time, and I don't know why I

19  was placed there.  I was switched with someone.

20     Q.   Was that also lockdown?

21     A.   That is lockdown.

22     Q.   24/7?

23     A.   Yes.

24     Q.   Did you have a roommate, a cellmate?

25     A.   Yes.

1    Q.   Was it always the same person?

2    A.   No.

3    Q.   Was Sheila Kizer one of them?

4    A.   She was the first one.  She was the one that was

5  there during the incident.

6    Q.   Right.  K-I-Z-E-R.

7    A.   I believe so.

8    Q.   Who was the other cellmate?

9    A.   Carina Warnick was a cellmate at one time.

10   Q.   C-O-R-R-I-N-A?

11   A.   C-A-R-I-N-A.

12   Q.   Warnick.

13   A.   W-A-R-N-I-C-K.

14   Q.   Anybody else?

15   A.   Yeah.  Kylie Montgomery.

16   Q.   Do you know how to spell that?

17   A.   K-Y-L-I-E.

18   Q.   Montgomery, I think I can do that one.

19   A.   Okay.

20   Q.   Anybody else?

21   A.   Not that I recall at this time.

22   Q.   And it was one at a time, one cellmate at a time?

23   A.   That's correct.

24   Q.   How many cells are in the holding section of Block

25  H?

1      A.    There's four cells down there.  There's a single

2  cell for one person, which sometimes they put cots in.  They

3  cram people in there.  And then there's three other cells,

4  one with a camera, and the other two are closer to the

5  receiving desk with two beds.  And, again, sometimes they

6  put mats on the floor or cots in there, whatever they have

7  to do.

8      Q.    During the time that you were in Holding, did you

9  have a bed or what?

10     A.    I slept on a metal -- or a cement slab.

11     Q.    According to this, you were moved from Cell 2, Bed

12  3 to Cell 4, Bed 2 at the end of May, on May 30, 2005.

13     A.    That's correct.

14     Q.    That sounds right to you?

15     A.    Yeah.  I was placed in a single cell because there

16  was no room in the holding area and my cellmate had gone to

17  State prison, which was Corina Warnick at the time.  So they

18  put me in a single cell by myself, and shortly afterwards

19  they put Kylie Montgomery in there on a cot.  But it's a

20  single cell, it's only made for one person.

21     Q.    And then, according to this, on June 8, 2005, you

22  were transferred to D Block -- the Section is D Block and

23  then the Block is D.  Do you see that?

24     A.    Yes.

25     Q.    And is that about -- does that comport with your

1   memory?

2       A.   That's correct.  That's a work-release block,

3   that's a privileged block.  So I went from a Holding 24/7,

4   after a phone call was placed, finally, by family and

5   friends, and I was placed on a privileged block suddenly.

6       Q.   What privileges do you have on that block?

7       A.   You get to stay up later.  You get to stay out

8   longer from your cell.  It's a smaller area so it's not --

9   you're not with general population.  Work release is in and

10  out of there, so you have more privacy.

11      Q.   Did you have work release?

12      A.   No.  I was a detainee, so I wasn't eligible for

13  work release.

14      Q.   Right.  And then it says you vacated that on

15  July 26, 2005.

16      A.   That's correct.  I went to SCI Muncy.

17      Q.   Oh, you went to SCI Muncy, not Cambridge Springs.

18      A.   That was the first State Correctional Institution.

19  I had to be classified.

20      Q.   What do you meant by that?

21      A.   They have classifications.  I was there about five

22  months.

23      Q.   In Muncy?

24      A.   Yeah.  They go by your record and decide what

25  level you are, whether or not you go to Cambridge Springs or

1    you stay in Muncy.  Muncy is a maximum security prison,

2    Cambridge Springs is a minimum security.

3        Q.    So you were in Muncy while they thought about

4    where they wanted to put you permanently?

5        A.    Well, they had to get all my paperwork from

6    Venango County and -- there's a whole process.

7        Q.    Have a committee meeting and all that stuff and

8    think about it.

9        A.    Yes.  There's a computerized -- they enter all

10   your information in in a computerized system, rate you one

11   through five.  And whichever number you come up as, decides

12   where you're going to be staying for the rest of your term.

13       Q.    Okay.  And I think I saw that in some of these

14   documents.

15       A.    I don't think it would be in any of the Venango

16   County.

17       Q.    If you look at Exhibit B, for example, it might

18   not be the same system, but it looks similar.  Right at the

19   bottom of each page it says, VCP, and there's a number.

20       A.    Yes.

21       Q.    Go to VCP-216.

22       A.    Yes.

23       Q.    Is that kind of the thing we're talking about?

24       A.    Yes.  State prison is a lot different than Venango

25   County Prison, but this is some of the stuff that they go

1    by.  This is a small, small section.  I mean, they go by

2    your education, your marital status, they go by -- it's way

3    more in-depth.

4         Q.    But conceptually, it's about the same type of

5    thing.

6         A.    That's correct.

7         Q.    Let's go to May 14, 2005.

8         A.    Okay.

9         Q.    As I understand it, the incident arose out of,

10   generally speaking, a visitation that day by your daughter?

11        A.    My family.  My daughter included.

12        Q.    Would that be your mother, she brought your little

13   girl in?

14        A.    She visits me regularly.  There may have been

15   other people, but I'm sure it was my mother and my daughter.

16        Q.    That wasn't the first time they had visited you.

17        A.    No.  They visited me every week.

18        Q.    Was there one day a week when visitation occurred?

19        A.    For women on W Block, it was to be on Saturdays.

20   Holding cells was to be on Wednesdays, but they still took

21   me on Saturdays.

22        Q.    Even after you got into the Holding cell?

23        A.    That's correct.  And the C Block, where the men's

24   Hole was, I believe their visitation was on Thursday.  But,

25   again, they let us visit with the other girls.  They never

1    changed our visitation, they always made it on Saturday.

2        Q.    Where there certain hours?

3        A.    Yeah.  I believe 6:00 to 8:00.

4        Q.    P.m.?

5        A.    Yes.  It's been a while.  I'm sure that's what it

6    is.  My mom was always there on the first visit at 6:00.

7        Q.    Where does the visitation take place?

8        A.    There's a visitation room.  It's right next to the

9    W Block unit, which would be from the Holding cells, which

10   would be, I don't know, the basement or the first floor,

11   then it would be up to the second floor is where visitation

12   would take place.

13       Q.    The Holding cell you were in, what floor was that

14   on?

15       A.    The first or the basement.  I don't know.

16       Q.    You're not sure which one.

17       A.    It's the very bottom floor of the prison.

18       Q.    Is it below ground level?

19       A.    No.

20       Q.    Do you have a window to the outside?

21       A.    Yes, but you can't see out of it.

22       Q.    But you are above ground level.

23       A.    I would run right next to the alley that runs

24   right next to it.  I would be level to the alley -- alleyway

25   or roadway.

1      Q.    And, I'm sorry, you just told me and I forgot.
2    The visiting place is on the second floor?

3      A.    That's correct.

4      Q.    And you were on 24/7 lockup in Holding.

5      A.    That's correct.

6      Q.    With Sheila Kizer at the time?

7      A.    That's correct.

8      Q.    And to get from Holding, from your cell -- what
9    was you cell number on Holding?

10     A.    I believe No. 2.

11     Q.    To get from there to the visitation area, do you
12   walk the stairs or take an elevator?

13     A.    There are stairs, which is an option, which has
14   cameras in it, but I was take to the elevator.

15     Q.    You were taken to the elevator on May 14th.

16     A.    That's correct.

17     Q.    And there's no camera in the elevator.

18     A.    That's correct.

19     Q.    How did you know that day that you were going to
20   have a visit?

21     A.    Because my visits came regularly.

22     Q.    Were they always at the same time?

23     A.    Always.

24     Q.    Did your mother get a hold of you in some way to
25   tell you she would be there, or did she just show up every

1  week?

2      A.    She just showed up.  But I did make regular phone

3  calls to her when I was permitted, from down there.  I had

4  difficulty making phone calls from where I was housed.

5      Q.    Because you were locked up 24/7?

6      A.    That's correct.

7      Q.    You had been in Holding for -- according to

8  Exhibit C, for six weeks by the time that visit took place,

9  right?

10     A.    Correct, as far as I recall.

11     Q.    Yes.  That's a good point because you don't

12 remember the exact dates.

13     A.    That's correct.

14     Q.    But you had been in there for at least a month.

15 Is that a fair statement?

16     A.    That's a fair statement.  I'd had more than one

17 visit while I was down there.

18     Q.    All right.  To get from Holding to the visitation,

19 were you always escorted by an officer?

20     A.    Correct.

21     Q.    And on May 14, 2005, were you escorted by an

22 officer?

23     A.    That's correct.

24     Q.    Was that Officer Keokee Craft?

25     A.    That's correct.

1          MR. MARNEN:  I'm going to spell that for you,

2          K-E-O-K-E-E; Craft is with a C.

3     Q.   Had Officer Craft ever escorted you before?

4     A.   No, not from the Holding cell.

5     Q.   When a female inmate is escorted in Venango County

6     Prison, is it always by a female officer?

7     A.   Yes.

8     Q.   And you had had visits from your mother and other

9     relatives every week since you had been in Venango County

10    Prison.

11    A.   That's correct.

12    Q.   And on all of those visits, were you always

13    escorted by an officer?

14    A.   That's correct.

15    Q.   But never Officer Craft, when you were in Holding.

16    A.   When I was in Holding, no.

17    Q.   But before that, you were?

18    A.   Yes.

19    Q.   Who were the other officers, or officer, who

20    escorted you while you were in Holding to visitations?

21    A.   Ms. Andres.

22    Q.   Do you know how to spell that?

23    A.   A-N-D-R-E-S.

24    Q.   Okay.

25    A.   And I really don't recall who else.

1     Q.    How about Bodine?

2     A.    Bodine?  I don't know if she escorted me from

3 Holding.  I believe that she had before, but I can't say for

4 sure.  She's a day-shift officer, so for her to have

5 escorted me in the evening would have been very rare.

6     Q.    Andres, however, you remember her doing it.

7     A.    Yes.  I remember her doing it.

8     Q.    What is her first name; do you know?

9     A.    I have no idea.

10     Q.    It's somewhere in the documents.  I've seen it and

11 I can't remember it.

12     A.    And Taylor -- Shelly Taylor, would have taken me

13 before.

14     Q.    Anybody else you remember?

15     A.    Not that I remember.  It's been a long time.

16     Q.    I know.  Listen, I'm just asking you questions,

17 and if the answer is I don't remember, that's fine.

18     A.    Okay.

19     Q.    Do you remember what time of day Officer Craft

20 came to get you that day?

21     A.    She came to get me around 6:00.

22     Q.    Would it help you if I gave you your statement?

23 You filled -- I think you filled out a statement about this

24 incident.

25     A.    Sure.

1          (Defendant's Exhibit D marked for identification.)

2     Q.   In fact, let me -- I'll give you a copy of it.  I

3  think I'm on Exhibit D.  I'm going to hand that to you right

4  now.  I'm going to get one more copy while you look at it.

5  Are you okay on your water?

6     A.   Yes.   (Witness reviews document.)

7     Q.   If you look at the Block 6 at the top of the first

8  page, it's labeled Time, do you see that?  It would be three

9  down on the right-hand side.

10    A.   Yes.

11    Q.   And it says 19:17 hours.

12    A.   That's correct.

13    Q.   I think that's 7:17 p.m.

14    A.   That's correct.

15    Q.   And you just told me 6:00 p.m., so would it be

16 7:00 p.m.?

17    A.   No.  If you read the first sentence of the

18 statement, I was called at five to 6:00 p.m. by CO Craft to

19 get ready for a visit.  This is the time of the incident

20 that -- this is the time that the Sheriff's Office was

21 already in the building and took my statement.  So it was

22 five to 6:00, like I said in the statement.

23    Q.   Sorry.

24    A.   That's okay.

25    Q.   So that's the time of the statement, not the time

1    of the incident?

2        A.    That's correct.

3        Q.    Let me make the record clear.  The 19:17 hours is

4    the time of the statement.

5        A.    Yes.  We had already had the police over there.

6        Q.    Do you mean Sheriff's Department?

7        A.    Sheriff's Department, yes.

8        Q.    And so at 5:55 p.m. Officer Craft came to get you,

9    right?

10       A.    That's correct.

11       Q.    And when she did that, Sheila Kizer, was she in

12   the cell with you?

13       A.    Yes.

14       Q.    And so did Officer Craft then simply walk up to

15   your cell and say something like it's time to go to your

16   visit?  What happened?

17       A.    To my -- to what I recall, she has to go around

18   the receiving desk and in through a door in order to open my

19   cell.  And she said, Fedorek, get ready for your visit, and

20   I said I was ready.  I believe, I mean, this was my routine

21   because they let us know when your visit is there because

22   sign up is early.  So they know who's coming in and who

23   isn't.  So I was aware of the fact that I had a visit at

24   6:00.  She notified me that she was there to get me and she

25   went around to open my cell.

1       Q.   Is the receiving desk near the Holding cell you

2  were in?

3       A.   Directly across from it.

4       Q.   Did you say there were four Holding cells?

5       A.   That's correct.

6       Q.   What kind of inmates are held in Holding cells?

7       A.   Suicidal or people who come in drunk where their

8  level hasn't dropped low enough to put them in general

9  population.

10      Q.   And other types, too?  I mean, you weren't there

11  for either one of those reasons.

12      A.   No.  Those are the only two types that I've ever

13  seen there.  I had been there for suicide watch at one

14  point, but -- and I've been housed in the Venango County

15  Prison before, so to my knowledge, those are the only people

16  that I've ever seen down there.

17       Or if you have a medical condition, like you have

18  to plug in a machine, they may house you down there because

19  they can't take the risk of having a machine plugged in in

20  general population.

21      Q.   And it's near the receiving desk, right?

22      A.   Yes.

23      Q.   Is the receiving desk where people are processed

24  when they come in there?

25      A.   Well, they've changed it.  It used to be where

1    they were processed, but they made a separate room back at

2    the end of the hallway of the Holding cells.  So basically

3    there's what they call a bubble, you can see in there,

4    there's stairs that go up to the upstairs for the officers'

5    usage.  But basically someone just stands there whenever

6    work release is coming in or a new inmate is coming in

7    before they take them back to where they book them.

8        Q.    And to get to a Holding cell, each Holding cell

9    has its own door, right?

10       A.    That's correct.

11       Q.    Is there another door that you have to pass

12   through to get into the Holding cell area?

13       A.    There's doors everywhere.  There's doors at each

14   end of each hallway.  So to get in or out of there,

15   there's -- I have a picture drawn, it was in my evidence.

16   Would you like me to get that?

17       Q.    Sure.  I'll make a copy of that.

18       A.    You should have a copy.  I submitted it with my

19   evidence, so there should be a copy somewhere.

20            (Defendant's Exhibit E marked for identification.)

21       Q.    We'll mark this one Defendant's Exhibit E.  I'm

22   handing you Defendant's Exhibit E, and that is a photocopy,

23   is it not, of a drawing you prepared before this deposition

24   took place?

25       A.    That's correct.

1      Q.    Okay.  And this is meant to be a schematic

2   drawing -- not to scale necessarily -- of a portion of the

3   Venango County Prison, correct?

4      A.    That's correct.

5      Q.    And let me just take a moment to look at it.  Is

6   this all one floor?

7      A.    Yes.

8      Q.    Is it -- which floor is it?

9      A.    This is the floor where I was housed.  I would say

10  the first floor, I guess.

11     Q.    The ground floor, but it's level with --

12     A.    With the ground.

13     Q.    -- with the ground outside.  So it is the first

14  floor, I guess.  And in the upper right-hand -- at the very

15  top of the page it says, "Men's Work Release, G Block."  Do

16  you see that?

17     A.    That's correct.

18     Q.    Is that an outside area?

19     A.    No, that's inside.

20     Q.    Okay.  That's where men who were on work release

21  are housed?

22     A.    That's correct.

23     Q.    It looks like there are -- are there cells in

24  there or is it kind of a dormitory?

25     A.    I believe it's like a dormitory, but --

1      Q.    You've never been in there?

2      A.    No.  I believe it's like a dormitory.  I've seen a

3    little bit of it.  There are beds in there and there's a

4    television and couches, so.

5      Q.    And then I see next to that, "Restroom and Chief

6    Deputy Warden," right?

7      A.    That's correct.

8      Q.    Is that Chief Deputy Warden Lyles?

9      A.    That would be -- I know Mr. Sabousky would be in

10   there.

11     Q.    Is that Michael, is that his first name?

12     A.    Yes.

13     Q.    S-A-B-O-U-S-K-Y?

14     A.    Yes.

15     Q.    And then there's a chapel there.

16     A.    Correct.

17     Q.    And an office.  And who's in the office, a

18   secretary or something like that?

19     A.    I don't know.  It's just an office that they use.

20     Q.    And the sally port that you have on there,

21   S-A-L-L-Y, is that where you enter to become an inmate in

22   the Venango County Prison?

23     A.    Yes, that's where the cars drive through.

24     Q.    But there's a door through which a person can walk

25   to get in there?

1    A.    Yeah.    All these little slash marks that you see,

2    they look like -- there's two lines.

3    Q.    I see them.

4    A.    Those are doors.    Those are all locked doors.

5    Q.    Okay.    So when you enter Venango County Prison

6    from the sally port, you go through one door into a

7    vestibule and then through a second door.

8    A.    That's correct.

9    Q.    And each one of those doors locks.

10    A.    That's correct.

11    Q.    And once you walk through those two doors, you

12    come to a hallway, I guess?

13    A.    Yes.    There would be a door on your right that

14    takes you over towards the men's work release.    And directly

15    in front of you would be the receiving and the desk.    And

16    that's an open area, that's not -- there is a little gate

17    there that locks, but it's an open area.    It's about

18    waist -- well, I would say, you know, it's waist high -- a

19    little higher than waist high.

20    Q.    That's the receiving and the desk for receiving,

21    correct?

22    A.    Correct.

23    Q.    What about the control room, is that enclosed?

24    A.    That's enclosed.    That's the bubble that I was in

25    reference to earlier where you can see the stairs that go up

1    to the second floor.

2        Q.    All right.  And in the control room, is that where

3    they have the cameras for the monitors -- I mean, the

4    monitors that the cameras are feeding in the various parts

5    of the prison?

6        A.    I don't know about that room.  I know that there's

7    another room that has the cameras.  But I don't know about

8    that room, I don't know exactly what's in there.

9        Q.    All right.  As you walk around the control room --

10   which you said was a room with walls on it, right?

11       A.    That's correct.

12       Q.    You encounter a camera by the kitchen.

13       A.    There's a camera by the kitchen that points toward

14   the elevator area.

15       Q.    Where's the elevator?

16       A.    The elevator is on the other side of the control

17   room.  You would have to come through the sally port into

18   the vestibule, into where the receiving desk area is,

19   through the locked door that's to your right, and around --

20   it's a sliding door, so you would have to go through that

21   sliding door and around the control room that's all enclosed

22   to get to the elevator.

23       Q.    And the elevator is what you use to get to the

24   Holding.

25       A.    To the second floor, yes.

1     Q.    The second floor.

2     A.    Yes.

3     Q.    The Holding cells, I forgot, are down here at the

4   bottom of the drawing on the same floor as you enter on,

5   right?

6     A.    That's correct.  Now, there are stairs in here

7   somewhere that take -- I believe the stairs are somewhere

8   near the chapel.  There's stairs that do take you upstairs

9   because you have to have -- for fire, another route from the

10   elevator.

11     Q.    But for ordinary travel during a typical day at

12   the Venango County Prison, you take the elevator.

13     A.    Yeah, they don't use the stairs.  The only time

14   I've ever seen the stairs used is when they took people from

15   the second floor to the first floor for church in the chapel

16   because there's a line of people.

17           Or I have seen -- I know that they brought in a

18   maximum security murderer who was going up on trial.  And

19   because they had to have that person on camera at all times,

20   I've seen them take them up the stairwell.  Other than that,

21   I've always traveled by elevator.

22     Q.    You've never gone up the stairs or down the

23   stairs?

24     A.    Only to church when I resided on the second floor

25   with general population.

1        Q.    Okay.  So on May 14, 2005, you were in Cell No. 2
2   in the Holding area, right?
3        A.    That's correct.
4        Q.    And so Officer Craft, where did she come -- where
5   was she when she said -- I think you said, "Fedorek, are you
6   ready for your visit," something like that?
7        A.    Something along those lines.  She came from the
8   booking area up to the hallway where she passed Cell No. 4,
9   Cell No. 3, and arrived to my cell at Cell No. 2.
10       Q.    What happens in booking?
11       A.    That's where they take you to classify you, to
12  enter your information, see if you're suicidal, and so
13  forth.
14       Q.    When you enter Venango County Prison the very
15  first time, is there any kind of search performed on you?
16       A.    Yes.
17       Q.    Is that done in booking, too?
18       A.    No.  There's a strip room right there.  You'll see
19  the shower and a strip room.  It's either done in the strip
20  room or in the storage room.  If they have somebody already
21  in the strip room, they'll take you in a closet.
22       Q.    All right.  So Officer Craft on May 14th came from
23  the booking area toward your Cell No. 2 and got outside of
24  Cell No. 2 and asked you if you were ready.
25       A.    Yeah.  And she had to open the door, so she would

1  have went around the desk, into the receiving area, and then

2  into the control room to open the door.

3       Q.   Oh, the door cannot be opened at the door, you

4  have to do it from the control room?

5       A.   That's correct.

6       Q.   And she did that, too?

7       A.   Yes.

8       Q.   Or did she ask someone to do it?

9       A.   No.  She did it.  Because they were short staffed,

10  so she had to go around and do it herself.

11       Q.   So she opened it.  So you had an unlocked door for

12  some period of time before she got there.

13       A.   That's correct.

14       Q.   And did you remain in your cell after she unlocked

15  it?

16       A.   Yes.  When she come back out the door -- and this

17  is to my recollection, she was standing at the receiving

18  desk area and asked me to come to the desk and got her

19  handcuffs out to handcuff me.  So I would have come out of

20  my cell and approached the desk and put my hands out to be

21  handcuffed.

22       Q.   And when you left your cell, was that door still

23  unlocked?

24       A.   She would have went back in and closed it again.

25  Or if somebody would have came down the stairs from the

1    control room, they may have closed it.

2        Q.    So someone did.

3        A.    Somebody did, yeah.

4        Q.    And to close the door, is it a door that slides or

5    is it on hinges?

6        A.    It slides.

7        Q.    So you don't have to -- am I correct in assuming

8    that don't have to be at the door to slide it, in fact, you

9    have to slide it from a remote location?

10       A.    Yeah.  They have to push a button for the door to

11   slide back and forth.

12       Q.    That's what I meant.  Thank you.  So to open or

13   close that door, you have to press a button in the control

14   room.

15       A.    That's correct.

16       Q.    And someone did it.  You don't know who it was,

17   but someone -- she opened it, you think.

18       A.    I think.

19       Q.    And somebody, maybe her, maybe somebody else,

20   closed it.

21       A.    That's correct.  There were other male officers

22   around because -- it's mostly males down there.  I've never

23   seen women housed down there as long as I've been housed or

24   anybody else has been housed.  It's all males that work down

25   there because they're always short staffed on females.

1      Q.    And you -- was Sheila Kizer in the cell when you

2  exited the cell?

3      A.    Yes.

4      Q.    Okay.  So you walked over to receiving where Craft

5  was.

6      A.    Yes.

7      Q.    And she had handcuffs.

8      A.    Yes.

9      Q.    What kind of handcuffs were they?  Were they metal

10 handcuffs?

11     A.    Yes.

12     Q.    And did you say that she said something about

13 handcuffing you?

14     A.    Well, I had to put my hands out.  And as I did so,

15 I was telling her that I didn't have to wear these

16 handcuffs, that I was told by another correctional officer

17 on first shift that I wasn't to be wearing them.

18     Q.    So you left your cell, and walked toward her at

19 receiving, and she was holding handcuffs -- metal handcuffs,

20 correct?

21     A.    Correct.

22     Q.    And did she say anything about putting handcuffs

23 on you?

24     A.    She said I had to wear them to my visit, and that

25 I would have to take it up with the Officer in Charge if I

1  had a problem with it.

2      Q.   Because you said you had never had to wear them

3  before.

4      A.   That's correct.

5      Q.   And after that -- after May 14th, did you ever

6  have to wear them again to visits?

7      A.   Yes.

8      Q.   And what visits, every one?

9      A.   No.   It was a hit and miss.   It depended on who

10  came to get me and who took me upstairs.

11      Q.   It depended on what officer it was.

12      A.   That's correct.

13      Q.   Did Officer Craft ever escort you again to a

14  visitation after May 14th?

15      A.   I don't recall.   I believe so, because I had a

16  problem with it, to my recollection.   And because, again,

17  they are always understaffed, I didn't have a choice in the

18  matter.

19      Q.   Before May 14th, had you and Officer Craft had any

20  personal difficulties between each other?

21      A.   Personally?

22      Q.   Yes.

23      A.   I don't know her personally.   I wouldn't have had

24  any personal problems.

25      Q.   Did you know her -- well, okay, I used the wrong

1    word.   Did you have any problems with each other before

2    May 14th?

3         A.   Not that I'm aware of.

4         Q.   Did you ever speak with her at all before May

5    14th?

6         A.   I've spoken to her as a correctional officer.   I

7    would have had to have, but, no.

8         Q.   How many female correctional officers where there

9    at the Venango County Prison in May of 2004, about,

10   approximately?

11        A.   I have no idea.   Not very many, I wouldn't say

12   more than five.   I don't know because there's different

13   shifts.

14        Q.   But you remember seeing about five.   Is that a

15   fair statement?

16        A.   At least.

17        Q.   Okay.   All right.   So you told Officer Craft you

18   never had to wear those before.   And she said, well, if you

19   want to discuss the subject, you have to do so with the

20   Officer in Charge.

21        A.   Well, not those exact words, but she -- along

22   those lines.

23        Q.   Tell me the words as you best remember them.

24        A.   As I best remember them was, if you have a problem

25   with it, you need to take it up with the OIC.