1      Q.    What was her tone of voice?  Did she have an

2    attitude?

3      A.    Yes, because she was very busy and she was the

4    only female working.

5      Q.    Okay.  What was your tone of voice?  Were you

6    matter of fact or did you have an attitude?

7      A.    I would have said I was defensive because of the

8    tone she took with me and that -- the understaffness (sic)

9    that they have there is so -- that's the only thing that's

10   consistent is that they're always shorthanded.  So -- from

11   where I was housed, I wasn't given the needs that I should

12   have been given or understood why I was even where I -- even

13   where I was.

14            So for -- there's so much inconsistency, I would

15   have said that I was on the defensive line about it.  She

16   took a tone with me and I tried to explain it to her and she

17   didn't want to hear it.  So, naturally, I would be like,

18   well, you know, you need to listen to me because this is

19   what I was instructed.

20     Q.    But she did put the handcuffs on you.

21     A.    Well, yeah.  And I put my hands out to have myself

22   handcuffed.

23     Q.    Were your hands in front of you or behind you?

24     A.    They were in front of me.

25     Q.    What was it about wearing handcuffs that concerned

1    you?

2        A.   The safety of them.  Because from what I was told

3    by other correctional officers, that we were not to visit

4    with general population as we were handcuffed because we

5    could be attacked by somebody who wasn't handcuffed.

6          So Holding cells aren't supposed to be visiting in

7    the first place with general population, but because of the

8    shortstaffedness (sic), we were.  And like I said earlier,

9    the Holding cells, according to the manual, are supposed to

10   have visits on Wednesdays, but we continued to have our

11   visits with general population on Saturdays.

12         So my concern was for my own safety, because I

13   didn't want to be with other people who weren't handcuffed

14   to where I could be attacked or something could happen to

15   me.  And it was put in my head by another correctional

16   officer that this could occur, so I had concerns.

17       Q.   Who was that?

18       A.   All of them.  Any one of them told me.  I know

19   Correctional Officer Bodine told me, tell her you're not to

20   wear handcuffs.  You either have to have your visits

21   separate from general population or you're not to be

22   handcuffed.  It was one or the other, and they didn't follow

23   that.

24       Q.   Did you tell Officer Craft that you were concerned

25   about your safety?

1    A.    Sure did.

2    Q.    What did she say, take it up with the OIC?

3    A.    She had no comment.

4    Q.    Were you also concerned about seeing your little

5  girl wearing handcuffs?

6    A.    No, because she's seen me before wearing

7  handcuffs.

8    Q.    All right.  And you weren't concerned about seeing

9  your mother wearing handcuffs.  Is that a fair statement?

10    A.    That's a fair statement.

11    Q.    Okay.

12    A.    My daughter was only six months old when I was in

13  the prison.  So for her to even remember any of this, she

14  wouldn't have.

15    Q.    She was six months old on May 14, 2005?

16    A.    No.  In May she would have been -- let's see, she

17  would have been 11 months old.

18    Q.    So she was pretty young.

19    A.    She was very young.  She was six months old when I

20  was incarcerated -- handcuffed in front of her outside of

21  our house.

22    Q.    Okay.  So did you and Officer Craft, then, go

23  looking for the OIC?

24    A.    We didn't go looking for him.  We ran into him en

25  route from Holding Cell No. 2 to the elevator.  He was

1    coming out of the kitchen area and we ran into him.

2        Q.    Did you walk that -- which way did you walk from

3    receiving?

4        A.    I walked the path that's on Defendant's Exhibit E.

5        Q.    So I guess you walked past the desk, and past the

6    vestibule, and through that sliding door, and you walked

7    towards the men's work release area.  And then turned the

8    corner and walked toward the elevator, right?

9        A.    That's correct.

10       Q.    And you ran into him about where the kitchen is.

11       A.    About where the kitchen and the camera is, yes.

12       Q.    And the OIC for the day was Douglas Buchanan,

13   right?

14       A.    That's correct.

15       Q.    Was Officer Buchanan -- what was his rank, officer

16   or something else?

17       A.    He was Officer in Charge only because they were

18   short staffed.  He was just a regular correctional officer

19   on any other given day.

20       Q.    So his rank was correctional officer; it wasn't

21   sergeant, or lieutenant, or anything like that.

22       A.    We had never addressed him as that, no.

23       Q.    All right.  So you ran into Officer Buchanan by

24   the kitchen.  Was he by himself?

25       A.    No.

1      Q.    With whom -- who else was there?

2      A.    There was a kitchen worker, I don't know who that

3  would have been.  There's a statement from him somewhere.

4      Q.    Is that Mr. Meitus or something?

5      A.    Yes, Mr. Meitus.  I didn't know his name, I

6  never -- I know he made a statement long after the incident

7  happened.

8      Q.    M-E-I-T-U-S, I think that's spelled.  Michael,

9  wasn't it Michael?

10     A.    I believe so.  It's somewhere in the exhibits.

11     Q.    So Michael Meitus was there and Officer Buchanan

12 was there, and anybody else?

13     A.    There may have been some people in the kitchen

14 area, other inmates, but it ended up just being Officer

15 Buchanan and myself standing out there.  This Mr. Meitus

16 went back in the kitchen.

17     Q.    How about Officer Struthers, was he there?

18     A.    He wasn't over in that area, no.

19     Q.    Or Officer Mason?

20     A.    No.  It was only me, Officer Buchanan, and Officer

21 Craft at that time.  I mean, we ran into him and everybody

22 else left the immediate area.  So it was just the three of

23 us left there.

24     Q.    And so --

25     A.    It wasn't even -- she was over by the elevator.

1    It was just him and I speaking over by the kitchen area.

2         Q.    So Officer Craft continued to the elevator?

3         A.    That's correct.

4         Q.    You stayed behind and talked with Buchanan.

5         A.    That's correct.

6         Q.    Tell me about that conversation.

7         A.    That conversation was that I stopped him and I

8    said, hey, you're the Officer in Charge, I need to tell you

9    that I'm not supposed to be --

10        Q.    When you did that, Craft kept walking.

11        A.    She kept walking.  She was pushing the button to

12   the elevator so the elevator would come.

13        Q.    So how far away was she from you when you were

14   talking to Buchanan?

15        A.    It's not that far away from each other.

16        Q.    10 feet?

17        A.    Yeah, give or take.  Yeah.

18        Q.    All right.

19        A.    So I told him that I needed to speak to him, that

20   I wasn't supposed to be wearing these handcuffs.  And I kept

21   being interrupted because the elevator had come down to the

22   first floor and she was screaming for me to get into the

23   elevator.  And I was still having conversation with the

24   Officer in Charge and she disrupted that by saying, come on,

25   you're not getting your visit.  And I was expressing to him

1    my concern for my safety wearing these handcuffs and that

2    another correctional officer on first shift had told me that

3    I wasn't supposed to be wearing them.

4        Q.    And you explained the reason, the safety reason.

5        A.    Sure did.

6        Q.    What did he say?

7        A.    He didn't comment because she was screaming for me

8    to get into the elevator.  And then she was screaming for me

9    to go back to my cell because my visit was not going to take

10    place.  So I really don't recall anything that he would have

11    said to me.

12        Q.    But he did say some things, you were just

13    distracted?

14        A.    Yeah.  I was distracted.  I can't recall exactly

15    what he said to me.

16        Q.    How long was your conversation with him?

17        A.    Not very long.

18        Q.    Less than a minute?

19        A.    No.  I would say probably a minute, at least.

20        Q.    So he said some things, you just can't remember

21    what they were, you were distracted too much to know what he

22    was saying.

23        A.    That's correct.  I know he was saying something

24    along the lines of having to wear them because he expressed

25    that to me later, but I didn't know what he was saying.  I

1  had them on regardless, and we were just en route.  She was

2  rushed because she was short staffed and she had to get up

3  there to get to the other inmates.

4      Q.    You're talking about Officer Craft.

5      A.    Officer Craft, yeah.

6      Q.    Now, you said she was screaming at you.

7      A.    Yes.

8      Q.    What does that -- she actually raised her voice?

9      A.    Yes.  Because we were 10 feet or so away from each

10  other, she was yelling, Fedorek, get in the elevator, get in

11  the elevator now.

12      Q.    You're going to lose your visit.

13      A.    No.  Then she walked back over to me and told me,

14  come on, you're not getting a visit, and took me back to my

15  cell -- to the Holding cell.

16      Q.    And what did Officer Buchanan do?

17      A.    He followed behind us.

18      Q.    Any idea why he did that?

19      A.    Because he was coming to speak to me.

20      Q.    To continue the conversation, you mean?

21      A.    I am assuming so.

22      Q.    Because he had a conversation at some point

23  thereafter?

24      A.    Yes.  And because we were being interrupted.  Like

25  I said, I was distracted so I wasn't really hearing what he

1  was saying to me.

2      Q.    So you were escorted back to your cell --

3      A.    Yes.

4      Q.    -- by Officer Craft.

5      A.    That's correct.

6      Q.    Did she do that gently or roughly?

7      A.    Roughly.

8      Q.    In what way?

9      A.    She was pinching the back of my arms and pushing

10 me.

11      Q.    Did she pinch the back of your arms the entire

12 trip?

13      A.    Well, it wasn't the first trip that she done that.

14 It was the second trip that she done that.

15      Q.    On the way back?

16      A.    Yes.  The first trip she just took me to my cell,

17 she put me in my cell, and she left me in there with my

18 handcuffs on.  And that's where Correctional Officer

19 Struthers had witnessed it.  And I asked my handcuffs to be

20 removed, and she said that she would get to it when she felt

21 like it.  So she left me in my cell with my handcuffs on.

22      Q.    We may be getting ahead of ourselves.

23      A.    I am.  This was the first time that she brought me

24 back.

25      Q.    The first time she brought you back, did she treat

1   you roughly -- physically roughly?

2        A.   No, not the first time.

3        Q.   And as you came back you were cuffed in front of

4   your waist, right?

5        A.   Yes.

6        Q.   And did she touch you as you walked back?

7        A.   She would have had to have held my arm.

8        Q.   She would hold your arm above the elbow.

9        A.   Back here (indicating).

10       Q.   By the -- above the biceps?

11       A.   Yes.

12       Q.   That's typical, isn't it?

13       A.   Yes.

14       Q.   So one hand on one bicep.

15       A.   Yes.

16       Q.   And was she to your left or right?

17       A.   I wouldn't remember.

18       Q.   And you walked back, right?

19       A.   That's correct.

20       Q.   With Officer Buchanan following.

21       A.   That's correct.

22       Q.   And when you got back to the cell, did she put you

23   back in the cell?

24       A.   Yes.  I don't believe she opened the cell, but she

25   put me in there, yes, because I had a conversation with her

1    about the handcuffs.

2        Q.    Was the door still open?

3        A.    After she left?

4        Q.    No, after she brought you back.

5        A.    No, somebody opened it.

6        Q.    Someone opened the cell.

7        A.    Yes.

8        Q.    When you got there, it was open.

9        A.    Yes.

10       Q.    She escorted you into the cell.

11       A.    Yes.

12       Q.    Was the cell door then closed?

13       A.    Yes.

14       Q.    And was it after that that you talked with Officer

15   Buchanan?

16       A.    Yes, because -- yes.

17       Q.    Did Officer Craft walk away before you had the

18   conversation with Officer Buchanan?

19       A.    Yes.  She went back toward the booking area, and I

20   believe that there's stairs back there.  I think she was

21   going back up to W Block because that's the way she came

22   down.

23       Q.    All right.  Did Buchanan come and talk with you?

24       A.    Yes.

25       Q.    And tell me about that conversation.

1    A.    Him and Mr. Mason -- Officer Mason were standing

2  at the receiving area at the desk and he told me I would

3  have to wear the handcuffs if I wanted my visit.  And I

4  replied that I have them on, it's not that I'm not going to

5  refuse to wear them, they're on, I'm wearing them.  I'm just

6  telling you, I'm reiterating once again, that I was told

7  that I should not have these on.

8    Q.    And he said you have to wear them.

9    A.    He said I had to wear them.  And I said, they're

10  on, I'm wearing them.

11    Q.    Did you express concern to him about your safety?

12    A.    Yes.  I expressed that the entire time.

13    Q.    What did he say to that?

14    A.    He said, this is where you're housed, you have to

15  wear them.  If she tells you you have to wear them, you have

16  to wear them.

17    Q.    What did being housed there have to do that?

18    A.    I don't know.  I don't know the rules of the

19  Holding cells.  I couldn't find anything that -- Venango

20  County hasn't supplied me with anything that says there's

21  any particular rules to the housing of the Holding cells.

22  There's no general rules for that area.  There's no handbook

23  for that area.

24        I mean, it says in the handbook your visitation

25  hours and what days, but they weren't following that.  So I

1    don't know what the rules to living down there are and whom

2    they apply to and whom they don't, because of the different

3    types of people that are housed there.

4            (Defendant's Exhibit F marked for identification.)

5        Q.   I'm going to show you what I'm going to mark as

6    Defendant's Exhibit F.  Obviously, the title of the document

7    is Venango County Prison Inmate Handbook, right?

8        A.   Correct.

9        Q.   And I -- you will agree with me, won't you, that I

10   gave you a copy of this in the course of discovery, right?

11       A.   That's correct.

12       Q.   Did you ever see this handbook before you got it

13   from me in discovery?

14       A.   From you in discovery, yes.  Before that, prior to

15   that, years ago, probably in 2002 I seen an Inmate Handbook

16   because they used to put them in our totes upon entrance to

17   the Venango County Prison.  And they claim for there to be

18   one on your housing unit, like W Block, there's supposed to

19   be one laying out, which I never seen this time in the

20   Venango County Prison.  And they certainly didn't have one

21   in the Holding cells.

22       Q.   So between December -- your admission in December

23   of '04, until you got out in July of '05, you didn't see one

24   of these handbooks?

25       A.   Not to my recollection -- not to what I recall.

1     Q.    I wanted to bring something to your attention.

2   I'm having trouble finding it, in case you hadn't noticed.

3   Please give me a moment.  I'll see if I can -- I think I

4   just found it.

5           Do you know whether the document in front of you,

6   Defendant's Exhibit F, is the Inmate Handbook from Venango

7   County Prison between December of 2004 and July of 2005?

8     A.    I don't know because I never seen one.  I don't

9   know if this is the old one I've seen before.  I don't know.

10    Q.    Okay.  What I'm looking for, and maybe it's not

11  here, is a requirement that persons housed where you were

12  housed in Holding when they move about the jail have to be

13  handcuffed.  Do you remember a requirement of that kind?

14    A.    I remember reading it in the discovery once you

15  had sent it to me.  I do remember seeing it in the discovery

16  you sent me.  But prior to that --

17    Q.    You were not aware of it.

18    A.    I was not aware of it.  And they didn't follow

19  that rule because I've been moved without handcuffs.

20    Q.    Did either Officer Craft or Officer Buchanan tell

21  you about that rule on May 14h?

22    A.    Never.

23    Q.    They just said you had to be handcuffed.

24    A.    Never gave an explanation why, never said to read

25  my handbook.  Because I've been told that before, read your

1    handbook.  But I never -- I do now that you're in reference

2    to it, and I have seen it in here.  I don't disagree with

3    you on that.

4        Q.    Okay.  I just wanted to see it in writing and I

5    cannot find it now.

6        A.    Are you sure it's in this one and not the

7    employee.

8        Q.    It might be the other one.

9        A.    I think it's in the employees' one, which there's

10   no way I would have had access to.

11       Q.    Sure.  I know, right.

12       A.    I believe it's in the employee handbook because --

13       Q.    I have it.  I have it.  This day, on May 14, '05,

14   do I understand you correctly, that -- well, let's try it

15   again.  The period of time you were in Venango County Prison

16   on this occasion was between December of 2004 --

17   December 4th of 2004 and July 26, 2005.

18            During that period of time, was this the only time

19   on May 14th when Officer Craft was taking you to visitation,

20   was that the only time that you were required to be

21   handcuffed?

22       A.    No.  I may have been handcuffed from C Unit, which

23   they refer to as the Hole.  We were handcuffed in there.  We

24   were handcuffed to other areas throughout the prison.  But

25   this was the only time that Keokee Craft had handcuffed me

1  from the Holding cell to visitation.  But it was also the

2  only time -- it was the first time she had ever taken me,

3  too.

4       Q.   Did anybody else -- when you were living in

5  Holding, did anybody else ever handcuff you to move you

6  about in the jail?

7       A.   It depended on where I was going, so, yes.

8       Q.   Sometimes, but sometimes not.

9       A.   Sometimes, sometimes not.  But to my visitation,

10  not that I recall had I been handcuffed.

11       Q.   What kind of places would they handcuff you to go

12  to?

13       A.   Recreation.  If we got it, you were handcuffed to

14  go to recreation.  And I believe that's the only place that

15  we would have gone besides visitation.  Now, I had gone to

16  the law library quite frequently.  I wasn't handcuffed to go

17  there, which was right next to the recreational area on the

18  second floor.

19       Q.   I'm going to get a copy of that other manual and

20  bring it over here, okay?

21       A.   Okay.

22            MR. MARNEN:  I'll make copies for both of us.

23            (Brief recess taken.)

24  BY MR. MARNEN:

25            (Defendant's Exhibit G marked for identification.)

1    Q.   I'm showing you Defendant's Exhibit G.  That's the
2    other manual you were talking about, right?
3    A.   That's correct.
4    Q.   That's Personnel Employee Manual.  You never saw
5    this before I gave it to you in discovery, right?
6    A.   That's correct.
7    Q.   All right.  If you turn to Page 47 of that
8    document, it's also stamped VCP-61.
9    A.   (Witness complies.)
10   Q.   And you let me know when you're there.
11   A.   I'm there.
12   Q.   The second paragraph down under the subheading,
13   Restraints, I'll read it to you:  "Inmates in locked housing
14   will be in restraints when moved out of their cells for any
15   purpose.  Staff on those units may carry handcuffs for
16   appropriate controls on the handling of cuff keys."
17        No one ever told you about that requirement before
18   I gave you a copy of this manual, correct?
19   A.   That's correct.  And it doesn't define what locked
20   housing is, because everywhere in the building, you're
21   locked in.
22   Q.   Okay.  Every inmate at Venango County Prison, when
23   you were there, was in an area that had a lock on it.
24   A.   That's correct.  And this is the Employee Handbook
25   and you and I didn't find it in the Inmate Handbook.

1     Q.   No, we didn't.

2     A.   So there's no way I would have been -- this wasn't

3  even reiterated to me as this is our policy or whatever.   So

4  there's no way I would have known this.

5     Q.   The only way you would have known is if it would

6  appear in the Inmate Manual, Exhibit F, or if they told you

7  that.

8     A.   That's correct.

9     Q.   And you were not given a copy of the manual nor

10  were you told that.

11     A.   That's correct.

12     Q.   What page was that on, 47?

13     A.   47, VCP-61.

14     Q.   All right.  Let's go back.  You are at -- you're

15  back at your cell.  I think you said you were in front of it

16  with Officer Buchanan, and Officer Craft left.  Do I have

17  that right?

18     A.   That's correct.

19     Q.   You weren't back inside the cell, but you were

20  outside the front of it.

21     A.   That's correct.

22     Q.   And he explained to you, for you to go to

23  visitation you had to wear handcuffs.

24     A.   Yes.

25     Q.   He did not explain to you why.

1     A.    That's correct.

2     Q.    And you told him you were concerned about your

3 safety.

4     A.    That's correct.

5     Q.    And he said you still have to wear them.

6     A.    That's correct.

7     Q.    Okay.

8     A.    And then I asked for another -- he told me I could

9 have my visit at that point.  I was permitted to have my

10 visit because I said I hadn't done anything wrong, except

11 express my concern.  And he told me he would call her back,

12 and I asked for another officer to take me.  And he

13 reiterated that they were short staffed and she was the only

14 one that could take me..

15     Q.    Did you say why you wanted another officer?

16     A.    I said that I didn't feel comfortable with her and

17 I wanted someone else to take me.

18     Q.    He said, we're short staffed, you'll have to --

19     A.    You'll have to deal with it.  I didn't have a

20 choice in the matter.

21     Q.    So did he communicate with her in front of you?

22     A.    She came back and --

23     Q.    How did he get her back; do you know?

24     A.    Radioed her.

25     Q.    So he had a radio and he called her to come back.

1    A.    Yes.

2    Q.    What did he say; do you remember?

3    A.    I don't remember.

4    Q.    Did he do it in front of you?

5    A.    Yes.

6    Q.    And he said something to the effect, come back

7 here, take her to visitation.

8    A.    Correct.

9    Q.    And he did come back?

10    A.    That's correct.

11    Q.    And as you waited for her to come back, did you

12 stay in front of your cell?

13    A.    Yes.

14    Q.    With your handcuffs on?

15    A.    Yes.

16    Q.    Officer Buchanan in your presence?

17    A.    Yes.

18    Q.    Any other officer there?

19    A.    Struthers was at the strip room/storage room area

20 taking care of work release inmates.  And Officer Mason was

21 floating around there.

22    Q.    How long did you wait for her to come back?

23    A.    Not long.  She must not have gone too far.

24    Q.    Minutes?

25    A.    Yeah.

1      Q.    She came back. And did she appear to be upset as

2  she came back to you?

3      A.    We didn't speak, so I don't know.

4      Q.    What was the look on her face? Did you notice

5  anything that was unusual?

6      A.    Mean, as usual.

7      Q.    Does that mean she was always mean?

8      A.    She always had a look about her. You knew what to

9  expect from her.

10     Q.    Okay. So she came back to you. Did she then

11 escort you back to the elevator?

12     A.    That's correct.

13     Q.    Did you walk the same way that you walked before?

14     A.    That's correct.

15     Q.    And on that trip from Holding Cell No. 2 to the

16 elevator, did you have any conversation with her?

17     A.    Absolutely not.

18     Q.    Did she say anything to you?

19     A.    Not until after we entered the elevator.

20     Q.    So during that trip from Cell No. 2 to the

21 elevator, before you got into the elevator, neither one of

22 you said anything.

23     A.    Silent.

24     Q.    Did she touch you during that trip?

25     A.    Yes.

1    Q.    Did she hold you, again, by the arm?

2    A.    In the normal manner.

3    Q.    In the normal manner?

4    A.    That's correct.

5    Q.    And did not exert too much force as she did that?

6    A.    No.

7    Q.    Did she push or shove you during that trip?

8    A.    No.

9    Q.    So it was a normal trip.

10   A.    Yes.

11   Q.    And is it fair to say that you have no objections

12   about that trip?

13   A.    I have no objection about that trip.

14   Q.    So you got into the elevator.  And when you got

15   into the elevator, were you the only two people in the

16   elevator?

17   A.    That's correct.

18   Q.    And there's no camera in there?

19   A.    That's correct.

20   Q.    Was there a conversation between the two of you in

21   the elevator?

22   A.    Yes.

23   Q.    Had the door to the elevator closed before that

24   conversation began?

25   A.    As the elevator door was closing, she began

1   speaking to me.

2        Q.    What did she say to you?

3        A.    She said, now, "what I was going to tell you was,"

4   and she had hit the button to go up, and I interrupted her.

5        Q.    And what did you say?

6        A.    I said don't speak to me.

7        Q.    And she said what, if anything?

8        A.    She said, I'm going to speak to you and you're

9   going to listen.

10       Q.    And --

11       A.    And --

12       Q.    Why don't you walk me through the whole

13   conversation.

14       A.    And I said that you can talk to me and I can hear

15   you, but I'm not going to listen to you.  And she then

16   proceeded to put her hands on me.

17       Q.    Now, what did you mean by that, I'm not going to

18   listen to you?

19       A.    Because I can hear her talking to me, but I wasn't

20   listening to what she had to say.  I knew what she was going

21   to say to me.

22       Q.    You mean you would listen to the noise, but you

23   wouldn't process it in your brain.

24       A.    Exactly.

25       Q.    Did you mean you were going to disobey her?

1    A.   She wasn't giving me any orders, so it wasn't a

2   disobeyment-type (sic) situation.   She was -- I knew what

3   she was going to tell me.   And she later on put in a

4   statement exactly what she was going to say to me, which is

5   exactly what I knew she was going to say.

6    Q.   Which was what?

7    A.   Which was that she was going to take the handcuffs

8   off of me once we arrived up there.

9    Q.   You knew she was going to say that?

10    A.   I knew she was going to say that.   When she said,

11   now, what I was going to tell you was when -- and she was

12   about to say when we get upstairs, and I knew that's what it

13   was.

14    Q.   Why did you tell her you weren't going to listen

15   to her?

16    A.   Because I didn't want to have any conversation

17   with her whatsoever.   I didn't want any conflict, I didn't

18   want any attitudes, any tempers, any -- anything between the

19   two of us.

20    Q.   Did she have an attitude as she talked to you in

21   the elevator?

22    A.   Yes.

23    Q.   What was her tone of voice?

24    A.   She's not a loud person, but cocky.

25    Q.   And did you have an attitude as you talked?

1        A.    I wouldn't say an attitude -- defensively.  I was
2   on the defensive end.
3        Q.    Did either one of you use inappropriate language
4   during that conversation?
5        A.    Yes.
6        Q.    Did she?
7        A.    Yes.
8        Q.    What did she say?
9        A.    I don't recall her exact words.
10       Q.    I'm looking at Defendant's Exhibit D.  I want to
11  take you down -- and I'm not -- I'm not doing this because I
12  want to be inappropriate, but I have to know the facts of
13  the case, okay?
14       A.    Yes.
15       Q.    So I'm going to read this to you.  You don't have
16  to read it, I'll do it, and you can tell me if it's what was
17  said.  One, two, three, four, five, six, seven, eight, nine
18  lines up from the bottom it says, and this is -- you said,
19  "I'm not going to listen.  CO Craft instructed me to get the
20  fuck out of the elevator."  Did she say that?
21       A.    Yes.
22       Q.    "And that I wasn't getting a visit."  Okay.  And
23  your statement goes on to say, "I said, you don't need to
24  talk to me like that and why am I not getting a visit, I
25  didn't do anything wrong.  She then called backup."  Right?

1        A.    That's correct.  I mean, I don't remember exactly

2    because it's been so long, but I do remember repeatedly

3    saying I didn't do anything wrong, I didn't do anything

4    wrong throughout the entire incident from this point on.

5        Q.    Did you use any inappropriate language toward her?

6        A.    It's possible.  I may have.  I don't recall

7    exactly.

8        Q.    I gave you a copy of her statements, too; do you

9    remember that?

10       A.    Yes.

11       Q.    There was some mention of language in there; do

12   you remember that?  I'm trying to save myself a trip back to

13   my office.

14       A.    I recall when she wrote me up for the incident in

15   the misconduct that she said -- I believe that's where she

16   may have said that I used vulgar language.

17       Q.    I guess I'm going to get that just to make sure we

18   cover it.

19       A.    Okay.

20             (Brief recess taken.)

21   BY MR. MARNEN:

22       Q.    Let's just move on.  Okay.  So I'm not sure where

23   I was, but I think I was --

24       A.    Vulgar language.

25       Q.    She accuses -- or you accuse her of -- now that

1    you read the statement, that's what she said, is that what

2    you're telling me today?

3         A.    That she used vulgar language?

4         Q.    Did she say, get the F out of the elevator?

5         A.    Yes.

6         Q.    And did she push you or anything like that out of

7    the elevator?

8         A.    She put her hands on me inside of the elevator.

9    She grabbed my by my handcuffs.  She yanked me around.  She

10   pushed me to the floor in the corner where they found me.

11   And she continued to place her hands on me after she called

12   for backup to the elevator and we went back down -- because

13   we were in between floors.  I don't know how we went from

14   first floor to second floor and back down to the first

15   floor.  I don't know.

16        Q.    So was the conversation while the elevator was

17   moving?

18        A.    Yeah.  It was moving and I believe she emergency

19   stopped it.  I think, I'm not even absolutely sure.  Because

20   I know I could hear the people in the elevator well that

21   were underneath us, and they were waiting for us to come

22   back down for the doors to open.  And when they opened, they

23   were all standing there with Mace cans.

24        Q.    So to go to visitation, you've told me probably

25   five or six times at my request, that you were going up.

1      A.    Yes.

2      Q.    And sometime during that trip is when this

3    conversation took place.

4      A.    Yes.

5      Q.    And when she told you to get the F out of the

6    elevator, where were you then?  Were you stopped somewhere?

7      A.    No.   It was after the doors had already opened and

8    she was yanking me.

9      Q.    And when they opened, what floor did they open on?

10     A.    They opened on the first floor.

11     Q.    So you went back down?

12     A.    Yeah.

13     Q.    Did the doors ever open to the second floor?

14     A.    No.

15     Q.    And you think she may have hit the emergency stop

16    on the way between floors.

17     A.    I think so.  I'm not absolutely sure.  I know that

18    we were en route going up, and we never made it up, and we

19    came back down.

20     Q.    And when you came back down, did she make a radio

21    call during that trip?

22     A.    Yes.

23     Q.    That's why people were there with Mace --

24     A.    Yes.

25     Q.    -- when the door opened.

1    A.    Yes.

2    Q.    And as you came back down, she was putting her

3  hands on you.

4    A.    Yes.

5    Q.    And she grabbed you by the handcuffs.

6    A.    She grabbed me in between the handcuffs where the

7  links would be to connect the two that go around your wrist.

8  And the entire time, that's where I recall screaming, I'm

9  not doing anything because I knew these people were waiting

10 at the bottom of the stairwell, and I hadn't done anything

11 wrong, and she was putting her hands on me.  So throughout

12 the entire incident, I was screaming I didn't do anything,

13 because I didn't understand --

14   Q.    The handcuffs connect to each other by a chain.

15   A.    Yes.

16   Q.    Was she grabbing the chain?

17   A.    She was grabbing the chain.

18   Q.    With one hand?

19   A.    Yes -- well, one or two.  I don't know.

20   Q.    I thought you said she was touching you someplace

21 else, too.

22   A.    She was pushing me -- yeah, she pushed me with her

23 hand.

24   Q.    Into the corner of the elevator.

25   A.    Yeah.  With -- yeah.  She would have pushed me in

1   the shoulder area.

2        Q.    And she pushed you downwardly, too.

3        A.    Yes.

4        Q.    Pushed you to the floor.

5        A.    Yes.

6        Q.    So you sat on your butt.

7        A.    I was sitting on my butt when they opened the

8   elevator doors.   I was hovered in the corner.

9        Q.    In a corner of the elevator?

10       A.    Yes.

11       Q.    So with one hand, you don't know which one, she

12   grabbed the handcuff chain.

13       A.    Uh-huh.

14       Q.    And with the other hand she pushed you around the

15   shoulder area down to the floor.

16       A.    Yeah.   It happened so fast, I don't -- I know she

17   was yanking me around and I was just being tossed around.

18   She's a big girl.   And then I ended up on the ground -- I

19   ended up on the floor of the elevator.

20       Q.    Were you physically resisting her at all?

21       A.    No, that's why I was being thrown around because I

22   was allowing her to let me swing, I guess.

23       Q.    As you had your conversation with her while the

24   elevator is moving, were you gesturing with your hands or

25   arms?

1      A.   No.  I couldn't have, I was handcuffed.

2      Q.   Well, you could raise them, I suppose, upwardly;

3  couldn't you?

4      A.   I suppose.

5      Q.   But you didn't do that.

6      A.   No.

7      Q.   Did you raise your voice?

8      A.   I'm sure it was louder than normal tone, but I

9  talk loud anyways.

10     Q.   And I think you said earlier that she's on the

11  quiet side in terms of volume.

12     A.   Yes.

13     Q.   Did she raise her volume, too, as you conversed in

14  the elevator?

15     A.   For her, she did.  It wasn't as loud as I get, but

16  for her, yes.

17     Q.   Is it fair to say the two of you were screaming at

18  each other?

19     A.   I wouldn't say screaming, but we were having a

20  very elevated conversation.

21     Q.   Very agitated, both of you?

22     A.   Sure.

23     Q.   Okay.  And she used an inappropriate word at least

24  one time.

25     A.   At least, yeah.  I would say we both used

1  inappropriate words.

2      Q.   You think both of you laced your conversation with

3  some words that were for emphasis.

4      A.   Yes.

5      Q.   That were colorful.

6      A.   Yes.

7      Q.   That you wouldn't use in polite conversation.

8      A.   No.

9      Q.   Okay.  Did either one of you call the other a

10  name?

11      A.   Not to my knowledge.

12      Q.   The grabbing you by the chain between the

13  handcuffs, was that, if you can tell, part of her effort to

14  get you down on the floor?

15      A.   No, because I was flip-flopping around the

16  elevator, it was moving, and she kind of had a hold of me

17  while she was pushing buttons, so I would say no.

18      Q.   Was she yanking you around the elevator?

19      A.   Yes.

20      Q.   Did there seem to be a purpose to it aside from

21  causing you discomfort?

22      A.   No.

23      Q.   All right.  When the doors to the elevator then

24  opened, you were sitting in the corner.

25      A.   That's correct.

1      Q.    And who was at the doors on the outside?

2      A.    Mason and Buchanan, that I recall.  And I don't

3   know if anybody else was or not.

4      Q.    What, if anything, did they do?

5      A.    There with standing there with Mace cans and they

6   were shouting for me to get up and get out of the elevator.

7   She was shouting for me to get the F out of the elevator.

8   And I was on the floor, so they pulled me up off the --

9      Q.    Who did?

10     A.    I believe Mr. Mason did.  I'm not sure.

11     Q.    How did he do that?

12     A.    He -- I don't even recall.  All I know is I was

13  lifted from the position I was -- I couldn't really move.  I

14  mean, I was just in shock.

15     Q.    Only by Mason?

16     A.    No.  Him and Craft removed me from the elevator,

17  and she walked me back to my cell.

18     Q.    By herself?

19     A.    No.

20     Q.    With Mason?

21     A.    With Mason and Buchanan behind her.

22     Q.    So she held you as you walked.

23     A.    And this is where she was pinching the back of my

24  arms and pushing me the entire way.  There was nobody in

25  front of us.  It was me, her -- she's a big woman -- and the

1    two guys behind her.

2        Q.   And she had you by the upper arm again.

3        A.   She had me by the back of my arms up underneath my

4    arms in the back.

5        Q.   And she was pinching you.

6        A.   And she was pinching me.

7        Q.   All the way?

8        A.   All the way.

9        Q.   Did that cause you pain?

10       A.   I pulled away from her.  That's where the flailing

11   of the arms comes from in her statement.

12       Q.   And how many times did she pinch you in that trip?

13       A.   Several.

14       Q.   Several?

15       A.   Several.

16       Q.   And you pulled away each time?

17       A.   No.  I didn't pull away until the very last time

18   that she pinched me.  And that's where the photos come in.

19       Q.   She was also pushing you?

20       A.   Yes.

21       Q.   And where was she pushing you?

22       A.   Pushing me in the back to move.  I wasn't walking

23   very fast.

24       Q.   All right.

25       A.   I was still under the impression that I was going

1    to get my visit because I hadn't done nothing wrong.

2         Q.    So you thought she was pushing you to get you

3    moving along faster?

4         A.    Yes.

5         Q.    Was there any conversation during that trip from

6    the elevator to your cell?

7         A.    Just me saying that I didn't do anything, that I

8    didn't do anything.

9         Q.    Nobody else said anything?

10        A.    There may have been conversation, but I was being

11   so loud that I hadn't done nothing.

12        Q.    Okay.

13        A.    Oh, there was more conversation.  I told her to

14   quit pinching me.

15        Q.    What did she say?

16        A.    That's where she grabbed me from the back and

17   tossed me over the receiving desk and that's where I scraped

18   my arms.

19        Q.    Did you ever pull away from her?

20        A.    The one time I pulled my arm -- because she

21   pinched me so hard.  I pulled my arm and I said don't touch

22   me.  And then she grabbed -- and I didn't pull away from her

23   like with my feet, or my body, or my torso, or anything

24   pulled away, just my arms flared out to the right.

25        Q.    And her reaction was to grab you and throw you

1    against the receiving desk.

2        A.    She -- it was a delayed reaction, she didn't do it

3    immediately.   I still took a couple of more steps toward my

4    cell before she actually had done that.

5        Q.    And how did she do that?

6        A.    She grabbed me by the back, by the shoulder area,

7    by the back.   And she pushed me to the right across the

8    receiving desk where I scraped my arm.   And then she put her

9    body over top of me and held me there until somebody opened

10   my cell door.

11              And that's when Mr. Struthers was standing in

12   front of me in the storage/strip room area because I was

13   facing him.   So he would have been the only officer in front

14   of me who watched her pinch me, who watched my arm pull from

15   her, and watched me take the other several steps to my cell,

16   and then watched her throw me across the desk.

17       Q.    As you lay across the desk, the desk, does it have

18   a flat surface?

19       A.    Yeah.   It would have been --

20       Q.    I'm trying to find out where the top of that desk

21   was on your body.

22       A.    Probably like right in the chest area.

23       Q.    Right around where the diaphram is?

24       A.    Yes.

25       Q.    Right below the ribcage.

1     A.    That I can remember.  All I know is I was hanging

2   over it.

3     Q.    Did that leave a mark?

4     A.    I don't recall being examined there.

5     Q.    But there were marks on your arms; weren't there?

6     A.    Yeah, all down my arms.

7     Q.    Your forearms and wrists?

8     A.    Yes.

9     Q.    How about your upper arms?

10    A.    Just up under here.

11    Q.    There was what kind of a mark there?

12    A.    A pinch mark.

13    Q.    Did it bruise?

14    A.    Yes.

15    Q.    And there were bruises on your -- on your wrists

16  and forearms?

17    A.    Yes.  Forearms were scraped up from the desk and

18  the handcuff prints that were there.

19    Q.    Handcuff prints?

20    A.    Like where she had yanked them, you could see

21  where they rubbed.

22    Q.    And what color were they?

23    A.    They turned black.

24    Q.    So they went black and blue.

25    A.    Yeah.  They weren't black immediately.  Like when

1    they took the pictures, they didn't turn black immediately.
2    But there are statements that the nurse observed it.
3        Q.    You saw a doctor two days later, right?
4        A.    Yes.
5        Q.    And did you see that doctor in the jail?
6        A.    No.
7        Q.    You went to the office?
8        A.    I insisted upon it, yes.
9        Q.    And by that time, were they -- was the color in
10   them the black-and-blue color?
11       A.    Yes.  They diagnosed me with muscle contusions.
12       Q.    So at the time that those photographs were taken
13   by the Sheriff's Department -- they were taken on May 14th,
14   right?
15       A.    Not even an hour after the incident.
16       Q.    You had no bruises yet?
17       A.    That's correct.
18       Q.    Because it takes time for bruises to develop?
19       A.    You could see a little bit in the pictures.  You
20   could see redness, but you couldn't -- yeah, you're correct.
21       Q.    Okay.
22       A.    But there is a statement from the jail nurse that
23   she'd seen bruises on my arms.  And, of course, there was
24   the outside office appointment that I had gone to.
25       Q.    Who is the nurse?

1      A.    I don't know.  And it's not legible in the

2    information that you provided to me.

3      Q.    How about the doctor, what's his name or her name?

4      A.    Dr. Beals.

5      Q.    B-E-A-L-E-S?

6      A.    B-E-A-L-S.

7      Q.    Dr. Beals is the jail doctor.

8      A.    No.  He was the outside doctor.

9      Q.    But doesn't he regularly see inmates at the --

10     A.    I've never seen him.

11     Q.    You haven't had any health problems, except for

12   this one?

13     A.    That's correct.  Would you mind if I took a break?

14     Q.    I do not mind.  Go ahead.

15          (Brief recess taken.)

16   BY MR. MARNEN:

17          (Defendant's Exhibit H marked for identification.)

18     Q.    I marked Defendant's Exhibit H, which is, as

19   you'll see, a Misconduct Report.  And on the left-hand side,

20   the indication is that Officer Craft was the reporting staff

21   member concerning this misconduct.

22     A.    Correct.

23     Q.    And this is simply an allegation, right --

24     A.    That's correct.

25     Q.    -- by Officer Craft.  And apparently, it was

1    delivered to you by Officer Andres.

2        A.    That's correct.

3        Q.    And this relates to the May 14, 2005 incident;

4    doesn't it?

5        A.    That's correct.

6        Q.    Okay.   It indicates there was going to be a

7    hearing on May 18, 2005, right?

8        A.    That's correct.

9            (Defendant's Exhibit I marked for identification.)

10       Q.    And then I have Defendant's Exhibit I.  And

11   Defendants Exhibit I, you'll see, does not have -- all these

12   other documents have VCP then a number on them and this one

13   does not; do you notice that?

14       A.    That's correct.

15       Q.    And that's because it was not produced to you

16   before.   It should have been, but it was not, it was an

17   oversight.   You're -- I'll give you a copy right now so you

18   can keep that for yourself.

19       A.    Thank you.

20       Q.    I have to give those other ones to her --

21   actually, I have an entire set here that I'll leave with you

22   and I'll give her the originals.

23       A.    Okay.

24       Q.    I'm not going to do that now because you have

25   plenty of things to look at right now.   Exhibit I is an

1    Inmate Request for Representation and Witnesses, right?

2        A.    That's correct.

3        Q.    Dated May 14, 2005 and filled out by you.

4        A.    There's correct.

5        Q.    So I guess the purpose of this form is that you're

6    identifying Officers Mason and Struthers and Inmate Kizer as

7    witnesses you would like to appear at the hearing on your

8    behalf, or at least give statements, correct?

9        A.    At least give statements, yes.

10            (Defendant's Exhibit J marked for identification.)

11        Q.    And then I have Exhibit J that I'll show you.

12    Exhibit J, the title is Disciplinary Review Board Hearing

13    Report, correct?

14        A.    Correct.

15        Q.    It is apparently signed by Deputy Sabousky.

16        A.    That is correct.

17        Q.    And in the middle of that document -- well, let me

18    just go down the document.  The misconduct date alleged is

19    May 14th of 2005, the time is 3:55 p.m., which can't be

20    right, correct?

21        A.    That's correct.

22        Q.    That's probably a mistake in the conversion

23    between military and civilian.  Your plea was not guilty.

24        A.    Correct.

25        Q.    And the verdict was guilty, right?

1      A.    That's correct.

2      Q.    And was that verdict rendered by Deputy Warden

3   Sabousky?

4      A.    That's correct.

5      Q.    No one else was there, right?  Was he the

6   decision-maker?

7      A.    CO Taylor was there, but she's just the witness.

8      Q.    And his decision appears in the middle; is that

9   right?

10     A.    That's correct.

11     Q.    Inmate continued in Hold cell, found guilty of

12  refusing to obey and will appeal.  That indicates that you

13  were found guilty and you were going to appeal.  You told

14  them that.

15     A.    Yeah.  There were four charges that she had

16  written me up for.  They found me guilty of one of them and

17  I said I would appeal that one.

18     Q.    If we go back to Exhibit H, the four charges were

19  refusing to obey an order, using abusive or obscene

20  language, repeated Class 2 misconduct, violation of rule not

21  specified.  Are those the charges?

22     A.    That's correct.

23     Q.    What order were you found guilty of refusing to

24  obey?

25     A.    I don't know.

1      Q.    Did you have a conversation with Deputy Warden
2   Sabousky on May 18th at the hearing about what he was
3   finding you guilty of?

4      A.    Yes.  And it had something to do with the
5   handcuffs, I believe.  And so I said I would appeal it
6   because the handcuffs were on the entire time.  But I've
7   also been told by Mr. Sabousky that you are always found
8   guilty of any misconduct that you're ever given because they
9   go by the officer's word.

10          So it wouldn't have mattered whether or not I pled
11  guilty or I pled not guilty, I still would have been found
12  guilty.

13          (Defendant's Exhibit K marked for identification.)

14     Q.    And, then, Exhibit K, I'm showing you right now,
15  is your appeal; is it not?

16     A.    That's correct.

17     Q.    The title of the document is Misconduct Hearing
18  Appeal.  And this is all in your handwriting, isn't it,
19  except for the printed stuff?

20     A.    That's correct.

21     Q.    You have two points you're making on appeal and
22  I'm going to read them.  The first one is, "On the first two
23  pages, CO Andres signed as ranking CO on duty, she then
24  signed as the person serving notice on the following two
25  pages."

1          "I also" -- the second one is, "I also don't feel
2    I was refusing to obey an order because there was so much
3    commotion and inconsistency in procedures."
4          A.    Okay.
5          Q.    What does that mean?
6          A.    I know -- I'm sorry, that brings back some
7    recollection.  I think what they found me guilty of was when
8    they told -- when she instructed me to get in the elevator
9    when I was having a conversation with the Officer in Charge,
10   I refused to obey an order because I was having a
11   conversation with someone who was a higher rank than her.
12   That's what they found me guilty of.
13          So I said that there was so much commotion and
14   inconsistency in the procedures, because granted, it was the
15   last order that was given, but I was still in a conversation
16   with someone of a higher rank.  I didn't understand how I
17   could have been found guilty of such a thing.
18          Q.    So this is the conversation you were having by the
19   kitchen with Officer Buchanan.
20          A.    That's correct.
21          Q.    And Officer Craft was over by the elevator telling
22   you to get on the elevator.
23          A.    Yes.
24          Q.    And distracting you from your conversation.
25          A.    Yes.

1     Q.   And the commotion you're talking about is what?

2     A.   Her screaming and him having a conversation with

3 me and just allowing all of this to go on.

4     Q.   And what was the inconsistency of procedures you

5 were referring to?

6     A.   The wearing of the handcuffs and not wearing of

7 the handcuffs.

8     Q.   Okay.  Sometimes you were required to do it and

9 sometimes you weren't.

10    A.   That's correct.

11        (Defendant's Exhibit L marked for identification.)

12    Q.   I'm going to show you now Defendant's Exhibit L.

13 This is signed by Chief Deputy Warden Foster Lyles.

14    A.   Right.

15    Q.   L-Y-L-E-S is how his last name is spelled.  And

16 it's dated May 18, 2005.  Did you personally appear before

17 him?

18    A.   It's dated May 24 when he signed it.

19    Q.   You're right, it is.  I'm sorry.

20    A.   No.  I did not appear personally before him.  I've

21 never had a conversation with him.

22    Q.   But was this document delivered to you at some

23 point?

24    A.   Yes.

25    Q.   By -- I mean, I gave it to you in discovery, but

1    you got it back when you were there, right?

2        A.    That's correct.

3        Q.    And this says, "After further review of your

4    misconduct, I see no reason to reverse their decision.    The

5    fact that the signing was in the wrong place, does not

6    change the fact that you were acting out what you wanted to

7    do or not to do, which is unacceptable.    The correct names

8    are on the misconduct.    Appeal denied."

9            Okay.    So this document was delivered you and that

10   was the end of it.

11       A.    That was the end of it.

12            (Defendant's Exhibit M marked for identification.)

13       Q.    Now, let me show you what I'm marking as

14   Defendant's Exhibit M.    And the title of this document is

15   Inmate Grievance.    Actually, there are two pages to this

16   document, one is VCP-12 and one is VCP-13.    And the first

17   page is the inmate grievance, right?

18       A.    That's correct.

19       Q.    The second page is inmate grievance response.

20       A.    That's correct.

21       Q.    All right.    The first page was prepared by you, at

22   least, most of it, right?

23       A.    This was prepared by me, yes.

24       Q.    Down to your signature.    And below that, I see

25   different handwriting.

1    A.    That's correct.

2    Q.    Okay.  So this is a grievance that you filed on

3 May 15, 2005 concerning the May 14, 2005 incident.

4    A.    I filed it, yes, May 15th concerning -- and I'll

5 tell you, the only reason it was May 15th, inmate grievance

6 is not easy to get.  You have to fight to get them, and I've

7 never been given one.  And there would have been a whole lot

8 of grievances from me if I would have been able to get my

9 hands on one.

10        The only reason I got this grievance was because

11 Correctional Officer Struthers had gone on a transport, he

12 came back on third shift.  He was late coming back from his

13 second-shift duties --

14    Q.    And this on May 14th?

15    A.    This was May 14th, second shift, when the incident

16 occurred.  May 15th would have been third shift, it would

17 have been after midnight, so it was still fresh.  And so

18 when he came back from his transport, he had overheard me

19 asking for a grievance.  I wasn't getting one.  And

20 somebody -- whoever I asked for it from, he said, well, what

21 happened.  And he had spoke up and said, well, here let me

22 tell you what happened, because he had everything written

23 down in a note pad.  And that was the only reason I was

24 given a grievance.

25    Q.    Who gave you the grievance?

1        A.    It was a correctional officer.   Sergeant MacKenzie

2   was the one who okayed it because he was the Officer in

3   Charge.   It was a woman who works third shift and they call

4   her Marie.   I don't remember her last name, but she gave me

5   the grievance.

6        Q.    When you say, give the grievance, you mean get the

7   form?

8        A.    To give me the form, yeah.

9        Q.    So you got the form during third shift on May 15th

10  from Marie.

11       A.    Yes.

12       Q.    And it was okayed by Sergeant MacKenzie, who was

13  the OIC at the time.

14       A.    That's correct.

15       Q.    You filled it out and you gave it to Deputy Warden

16  Sabousky -- I'm sorry, no.   You gave it to whom?

17       A.    CO Winters, Officer Receiving Grievance on the

18  bottom left.

19       Q.    I see that.   Thank you.   And it says, your

20  complaint here, your grievance here is -- I'm going to read

21  it.   "With an incident that occurred on May 14th" -- or

22  "5/14/05, CO Craft used obscene language (CO Mason to wit)

23  and unnecessary force (CO Mason, Struthers, Inmate Kizer to

24  wit) on me.   See also:   Sheriff's report."

25            I don't ever want to see her again.   I wouldn't

1    leave her alone in an elevator with an inmate.  But as far

2    as others go, I think she's needs training on how to handle

3    situations as a CO, not a police officer, and some time off

4    without pay to think about what she'd done and to cool off

5    wouldn't hurt."  Signed Jennifer Fedorek, correct?

6         A.    That's correct.

7         Q.    Why are you smiling?

8         A.    Because it just -- it was -- it was -- they always

9    want something written like what do you want done about it.

10   So I didn't know what to write, so that's what I wrote.

11        Q.    And then the initial action taken, it says, "Given

12   to Deputy Warden Sabousky," and it's signed by Sergeant

13   MacKenzie?

14        A.    That's correct.

15        Q.    Now, did you know that he did that when he did it?

16        A.    No.  I didn't see this again.

17        Q.    You didn't know this until you got this document

18   from me in discovery?

19        A.    That's correct.

20        Q.    But you knew you gave the -- you filled out the

21   grievance form, you signed it, and you gave it to somebody.

22   I forget who you said.

23        A.    CO Winters.

24        Q.    CO Winters.

25        A.    Yes.

1    Q.    And did you ever -- Page No. 2, did you get that

2   back from somebody?

3    A.    Yes.

4    Q.    And that is the Inmate Grievance Response, right?

5    A.    Yes.

6    Q.    And is your handwriting on there anyplace?

7    A.    No.

8    Q.    Do you recognize the handwriting?

9    A.    Yes.

10   Q.    Whose is it?

11   A.    Mr. Sabousky.

12   Q.    And he has signed it in the lower left-hand

13   corner.  Do you agree with that?

14   A.    Yes.

15   Q.    And dated it May 27, 2005, right?

16   A.    Yes.

17   Q.    Action taken, it says, "Chief Deputy Warden or the

18   Warden will look into the entire incident.  Any action that

19   may be taken will be the private concerns of the Venango

20   County Prison and it's management."  So you got this

21   document back and it said that?

22   A.    That's what it said.

23   Q.    Did you have a conversation with anybody about it?

24   A.    Couldn't get any conversation with anybody.

25   Q.    Do you know what this means?

1    A.    It means that they're not going to do anything

2  about it and they're not going to tell me anything about it.

3  It ended there.   There was no repercussion that I'm aware

4  of, there was nothing done.   She continued to work, she

5  continued to come to my cell, she continued on as if nothing

6  had happened to her as any type of repercussion, and nobody

7  asked me anything more about the incident.   They didn't look

8  into the entire incident or otherwise they would have -- I

9  was involved in it, I would think that they would have asked

10  me what happened.

11    Q.    Jennifer, at the top of the Inmate Grievance

12  Response, it says Grievance No. 55-0516; do you see that?

13    A.    Yes.

14    Q.    And it says date received 5/17/2005.

15    A.    Yes.

16    Q.    What does that date received mean?   Is that the

17  date that you received -- that they received your grievance?

18    A.    I believe that's the date they received my

19  grievance.   I'm not absolutely sure.

20    Q.    You filled it out on May 15th, but this seems to

21  indicate that Deputy Warden Sabousky didn't get it until

22  May 17th.   Is that what your interpretation of this is?

23    A.    I believe so.   I don't know.   That's their

24  paperwork.

25    Q.    And it says grievance classification, informal.