7/6/2006

has engaged in conduct prohibited by this Policy or who is found to have an alcohol concentration of 0.02 or greater but less than 0.04 until the start of the DOT covered or safety-sensitive employee's next regularly scheduled duty period, but not less than 24 hours following administration of the test.

DOT covered or safety-sensitive employee(s) who have engaged in prohibited conduct shall be advised by the County of the resources available to him/her in evaluating and resolving problems associated with the misuse of alcohol and use of drugs. Each DOT covered employee or safety-sensitive employee who engages in conduct prohibited by this Policy shall be evaluated by a substance abuse professional, who shall determine what assistance, if any, the DOT covered or safety-sensitive employee needs in resolving problems associated with alcohol misuse and drug use. Before returning to duty to perform a safety-sensitive function, the DOT covered or safety-sensitive employee is required to undergo a return-to-duty alcohol and/or drug test with results indicating an alcohol concentration of less than 0.02 and/or a verified negative drug test as well as follow-up drug and/or alcohol testing as directed by a substance abuse professional. The County, may, in its discretion, keep the DOT covered or safety-sensitive employee's position open while such employee attempts to become requalified. The County also may take action against the DOT covered employee or safety-sensitive employee up to and including termination under its own independent authority as an employer.

B.  Employees found illegally selling or distributing, arrested or convicted for selling or distributing controlled substances during work or while off work will be subject to suspension and possible termination from employment.

C.  Refusal to test and test tampering. The County shall discipline, up to and including termination of employment, any employee for a refusal to test or an attempt to tamper with a test. In the event that an applicant refuses to submit to drug and/or alcohol testing or attempts to tamper with such collection and testing procedures, then the applicant shall not be considered for employment with the County and the conditional offer of employment shall be withdrawn. All applicants and employees will be required to sign an Employee Drug and Alcohol Testing Consent and Release Form. If an applicant refuses to sign, he/she will not be considered for employment. If an employee refuses to sign, he/she is subject to discipline, up to and including termination.

D.  Employees who voluntarily undergo counseling and/or rehabilitation for violation of this Policy will be entitled to apply for FMLA and use their accrued leave for time spent in treatment as outlined in a treatment plan of

Created 11/9/2004

27

Appendix 201.

his/her substance abuse professional and/or as an in-patient in a rehabilitation facility. However, after exhausting their leave entitlement, the employee must apply for a Leave of Absence without pay; and if such leave is granted, the employee will be governed by the County's Leave of Absence Policy.

## V.    DRUG AND ALCOHOL TESTING

The County shall conduct tests for alcohol and/or the alleged use of drugs in the following circumstances:

### A.    PRE-EMPLOYMENT TESTING

The County requires a pre-employment drug test to be administered to all applicants. The applicant must submit to testing at the date and time specified by the hiring officer. The candidate for employment must be prepared to complete the testing within 24 hours of receiving the conditional employment offer.

Any applicant who is given a conditional offer of employment must receive a negative drug test result. An applicant whose test result is positive will not be considered for employment, and the conditional offer of employment shall be withdrawn. An applicant who refuses to submit to testing as required by the hiring officer shall not be considered for employment and the conditional offer shall be withdrawn.

Note: Should a current employee transfer into a DOT or safety-sensitive position from a position which did not previously require drug/alcohol testing, the same testing as that of a new candidate will be required of the current employee BEFORE she/he may assume the new DOT or safety-sensitive position duties.

### B.    RANDOM TESTING

Those employees in safety-sensitive and DOT positions are required to submit to unannounced controlled substance drug and alcohol testing at the annual percentage rate set forth by the County by memorandum in January of each year in compliance with Federal/State requirements. The selection of employees for random alcohol and controlled substances testing shall be made by a scientifically valid method, as determined by the Laboratory, such as a random number table or a computer-based random number generator that is matched with the employees' Social Security numbers, payroll identification numbers, or other comparable identifying numbers. Under the selection process used, each employee shall have an equal chance of being tested each time selections are made. Each employee who is notified of selection for random alcohol

Created 11/9/2004                  28

Appendix 202

7/6/2006

and/or drug testing shall proceed to the test site immediately, provided, however, that if the safety-sensitive or DOT employee is performing a safety-sensitive function at the time of notification, the County shall instead ensure that the employee ceases to perform the safety-sensitive function and proceeds to the testing site as soon as possible.

Note:   To ensure that the tests measure alcohol concentrations at appropriate times during the workday, tests must be scheduled to coincide with the performance of safety-sensitive duties.  TESTING MAY NOT BE ANNOUNCED UNTIL JUST BEFORE IT IS CONDUCTED.

Alcohol Testing – The employee shall only be tested while she/he is performing safety-sensitive functions, immediately prior to performing, or immediately after performing safety-sensitive functions.

Drug Testing – Drug testing may be performed at any time while the employee is at work for the employer.

C.   **REASONABLE SUSPICION TESTING**

The County shall require all employees - DOT covered, safety-sensitive and non-DOT or non-safety-sensitive - to submit to reasonable suspicion drug and/or alcohol testing when; in the judgment of a trained manager, i.e., Elected Officials, Department Heads, and based on information known at the time the decision to test is made, there is a reasonable suspicion to believe that an employee has violated the prohibitions of this Policy or exhibits the physical signs and symptoms of substance abuse, including, but not limited to the following:

1.   Has used, possessed, sold, delivered, or been under the influence of drugs or alcohol or both in violation of this Policy, EXCEPT when in the course of completing a job assignment.

2.   Exhibits the physical signs and symptoms of substance abuse; i.e., irregular speech patterns, loss of coordination in walking, grasping and balancing, and memory lapse, etc.

3.   Is subjected to a police investigation, arrest or conviction, related to drug use, possession or distribution;

4.   Has tampered with a drug or alcohol test;

5.   Engages in fighting and assaults, or aggressive or violent behavior;

Created 11/9/2004

Appendix   203

7/6/2006

6.  Is involved in a flagrant violation of established safety, security, or other operating procedures.

Reasonable Suspicion testing procedures shall be coordinated by the Director of Human Resources. Trained managers shall report their suspicion to the Human Resources Director, at which time a decision will be made whether or not to initiate a Reasonable Suspicion Test of an employee. In the event the Director of Human Resources is unavailable, the Chief Clerk will be contacted. Any disputes will be referred to the Director of Substance Abuse.

**D.    POST-ACCIDENT TESTING**

The County shall require any employee involved in a job-related accident or incident which includes the apparent violation of a safety rule or standard; involves a reportable injury for workers' compensation purposes; or which resulted or may have resulted in death, serious physical injury or serious property or equipment damage, to submit to alcohol and/or drug testing as soon as possible.

An alcohol test which is required, due to an accident or incident, should be conducted within two (2) hours following the event. If not performed within two (2) hours, the County shall prepare a record stating the reason for the delay. If the alcohol test is not conducted within eight (8) hours of the event, the County shall make no further attempts to perform the test and shall prepare a record detailing the reason for the delay. Drug testing must be done within thirty-two (32) hours of the accident following the accident.

Any employee who is subject to post-accident testing and fails to remain readily available for such testing, including, but not limited to, notifying the Drug Free Program Coordinator of his/her location if he/she leaves the scene of an accident prior to such testing, will be classified as having refused to submit to testing. An employee who is seriously injured and cannot be tested at the time of the accident must provide the necessary authorization for the County to obtain hospital records and other pertinent documents that might indicate whether there were drugs in his/her system.

In no way is this post-accident test requirement intended to delay necessary medical treatment for injured people following an accident or to prohibit an employee from leaving the scene of an accident to obtain medical assistance for others or for personal medical assistance.

7/6/2006

### E.    RETURN-TO-DUTY

The County will permit an employee who has violated this Policy and who has taken a leave of absence for treatment of a substance abuse disorder as a result of a Policy violation to return to duty. Before being permitted to return to duty, the employee must test negative on a return-to-duty drug and/or alcohol test.

Any employee so tested will not be authorized to return to duty unless the test results are negative for the presence of drugs and an alcohol test result indicating an alcohol concentration of less than 0.02 from urinalysis.

Each employee who has engaged in prohibited conduct may be advised of the resources available in evaluating and resolving problems associated with the misuse of alcohol and use of controlled substances, including the names, addresses, and telephone numbers of substance abuse professionals and counseling and treatment programs.

When an employee's drug or alcohol dependency has resulted in a violation of this Policy or job performance problems, the County may require any employee to engage in and/or complete treatment as a condition of continued employment.

## POST TREATMENT FOLLOW-UP

Following a determination by a Substance Abuse Professional (SAP) that a DOT covered or safety-sensitive employee is in need of assistance in resolving problems associated with alcohol misuse and/or use of controlled substances, the said employee may be subject to unannounced follow-up alcohol and/or drug testing, as a condition of continued employment. The Post Treatment follow-up testing will be determined by the SAP, but must consist of at least six (6) tests in the first twelve (12) months, for up to sixty (60) months from the date of the employee's return to duty. The SAP has the discretion to terminate the requirement for follow-up testing at any time after the first six (6) tests have been administered, if the SAP determines that testing is no longer necessary.

The County encourages its employees who are chemically dependent to seek treatment voluntarily and may assist employees in seeking appropriate treatment programs. For those employees who voluntarily enter treatment and/or rehabilitation, the County will be as supportive of their recovery as possible without negatively impacting business operations. The County welcomes the opportunity to participate in any treatment and continuing care plan to the extent deemed advisable by the treatment professional and is permitted by business concerns. In

Created 11/9/2004

31

Appendix    205

particular, the County may work with the treatment professional to structure a follow-up drug and/or alcohol testing program instituted with the consent of the employee.

**F.    DRUG-FREE AWARENESS EDUCATION**

All employees are to be informed of the County's Substance Abuse Program and made aware of its contents. In order to protect the safety and health of its employees, the County will present a Drug-Free Awareness Education program to all employees on an annual basis. Employee and Supervisor training will include at least 2 hours of training concerning:

1.  County Drug and Alcohol policy
2.  Dangers of drug abuse in the workplace
3.  Available treatment resources
4.  Recognizing, observing and documenting symptoms of drug and alcohol abuse and referral procedures.

## VI.    TESTING PROCEDURES

### A.    DRUGS

Testing for employees' illegal use of drugs normally will be conducted through urine specimens collected on-site or at an approved off-site collection facility. In special circumstances, including, but not limited to, accidents, blood testing for the illegal use of drugs may be done instead of, or in addition to, urine. The designated collection site will take the necessary steps to assure that the specimen is not adulterated or tampered with and that a strict chain-of-custody is maintained. The County shall require all employees' specimens to be tested and analyzed for a five panel test which shall include the following substances:

Cannabinoids (THC-Marijuana)        (Amphetamines Methamphetamines)
                                    Phencyclidine (PCP)
                                            Opiates (Heroin, Morphine)
                                    Cocaine

All urine samples will undergo an initial test using the immunoassay technique drug screening procedure. If the specimen tests positive for any one of the drugs listed above, then the sample may be subject to a confirmation test with Gas Chromatography/ Mass Spectrometry (GC/MS).

Employees will be compensated for testing time as well as travel time to and from the testing location.

Created 11/9/2004                    32

Appendix 206

7/6/2006

**B.**

## TESTING PROCEDURES FOR ALCOHOL

Testing for alcohol normally will be conducted through either a saliva or a breath specimen for non-DOT or safety-sensitive employees and through a breath specimen for DOT employees which shall be collected on-site, at the scene of an accident, or at an approved off-site collection facility. In special circumstances, including, but, not limited to, accidents, blood testing for alcohol may be done instead of, or in addition to, saliva or breath testing.

An initial screening test will be performed. If the blood alcohol concentration is less than 0.02, the test is considered negative. If the screening test results show an alcohol concentration level of 0.02 or greater, then a confirmation test will be conducted. The confirmation test may be conducted on an Evidentiary Breath Testing (EBT) device approved for use in the United States Department of Transportation's Drug and Alcohol Misuse Prevention Program, or through a blood test if necessary. If the confirmation test reads positive, 0.02 or greater, the test results shall be considered positive and the employee will be subject to disciplinary action as specified in this Policy.

Employees will be compensated for testing time as well as travel time to and from the testing location.

## REVIEW OF TEST RESULTS BY MEDICAL REVIEW OFFICER

All positive drug test results for employees will be reviewed and interpreted by a Medical Review Officer (MRO) before the test results (positive or negative) are reported to the County's Drug Free Program Coordinator. An MRO is a licensed physician with knowledge of drug and alcohol abuse disorders. The MRO is not an employee of the laboratory.

The MRO review of a positive test result may include conducting a medical interview (typically conducted over the phone with the employee) and review of the tested employee's medical history, or review of any other relevant biomedical factors. The MRO will review all medical records made available by the tested employee when a confirmed positive could have resulted from legally prescribed medication or physician-directed over-the-counter drug use.

Prior to making a final decision to verify a positive test result, the MRO will give the tested employee an opportunity to discuss the test result with him or her. The MRO will contact the tested employee directly, on a

Created 11/9/2004

33

7/6/2006

confidential basis, to determine whether the employee wishes to discuss the test result.

If after making all reasonable efforts and documenting them, the MRO is unable to reach the tested employee directly, the MRO shall contact the Drug Free Program Coordinator, who will direct the tested employee to contact the MRO as soon as possible. In such circumstances, the Drug Free Program Coordinator will, to the maximum extent possible, ensure that the requirement that the tested employee contact the MRO is held in confidence. If the tested employee does not contact the MRO within five (5) days after being instructed to do so, the MRO will report the test as being positive. Should the employee subsequently present satisfactory documentation that serious illness, injury, or other circumstances unavoidable prevented the employee from contacting the MRO within the five (5) days and present legitimate explanations for the failure of the drug test, the MRO may change the test result.

If the employee refuses to talk with the MRO regarding the positive drug test result, the MRO shall validate the failure and record the drug test as an unconfirmed positive. If the MRO determines that there is no alternate medical explanation for the positive test result, the MRO will report to the Drug Free Program Coordinator that the test result is positive. If the MRO determines that a legitimate medical explanation exists for the test results, the MRO will report to the Drug Free Program Coordinator that the test result is negative.

## C.    EMPLOYEE VERIFICATION OF POSITIVE TEST

If the portion originally analyzed (the primary sample) is positive, DOT employees shall have the right to specify a laboratory certified by U.S. Department of Health and Human Services to which the preserved sample portion will be sent for an independent analysis. The employee will be advised of this right and the employee must exercise this right within 72 hours of receiving notification by submitting the request to retest to the Drug Free Program Coordinator. The verification test costs shall be the responsibility of the employee unless the tests results are negative and then the County shall be responsible. The verification test results shall be controlling.

## D.    REFUSAL TO TEST AND TEST TAMPERING

Any employee who refuses to submit to testing, tampers or attempts to tamper with the testing will be subject to termination of employment. An applicant who refuses to submit to a drug test in the time frame

Created 11/9/2004                    34

designated by the County will be considered as withdrawing his/her application for employment. Refusing to submit means that an employee:

1.    Fails to provide adequate breath for alcohol testing without a valid medical explanation after he or she has received notice of the requirement for breath testing;

2.    Fails to provide an adequate urine sample for drug testing without a genuine inability to provide a specimen as determined by a medical evaluation after he or she has received notice of the requirement of urine testing; or

3.    Engages in conduct that clearly obstructs the testing process, including, but not limited to, the giving of the specimen, the chain of custody, or the testing procedure.

E.    **INABILITY TO PROVIDE SPECIMEN**

1.    Urine.  In a situation where an employee or applicant is unable to provide a sufficient urine sample, the person administering the test at the collection site will instruct the employee or applicant to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three (3) hours or until the employee or applicant has provided a new urine specimen, whichever occurs first.

(a)    Refusal to drink or provide a second sample.  If the employee or applicant refuses to drink fluids as directed or to provide a new urine specimen, the collection site person will terminate the collection and notify the Drug Free Program Coordinator that the employee or applicant has refused to submit to testing.  The County shall consider this situation to be a refusal to test under this Policy.

(b)    Insufficient quantity.  If, after following the directions of the collection site person, as described above, the employee or applicant still cannot provide a sufficient urine specimen within three hours of the first unsuccessful attempt to provide the specimen, the collection site person shall discontinue the collection and notify the Drug Free Program Coordinator.

(i)    Employees.  If the person being tested is an employee, the County will then direct the employee to obtain as soon as possible after the attempted provision of urine, an evaluation from a licensed physician, who is acceptable to the County, to determine whether the employee's ability to provide an adequate amount of urine is a result of a "medical condition".

Created 11/9/2004

35

7/6/2006

To be a result of a medical condition there must be an ascertainable physiological condition (e.g., a urinary system dysfunction) or a documented pre-existing psychological disorder. Unsupported assertions of "situational anxiety" or dehydration will not constitute a "medical condition".

The physician will provide to the MRO a brief written statement setting forth his or her conclusion and the basis for it, which will not include detailed information on the medical condition of the employee. Upon receipt of this statement, the MRO will report his or her conclusions to the Drug Free Program Coordinator in writing. If the physician determines, in his or her reasonable medical judgment, that a medical condition has, or with a high degree of probability, could have precluded the employee from providing an adequate amount of urine, the employee's failure to provide an adequate amount of urine shall not be deemed a refusal to test. If the physician cannot so determine, the employee's failure to provide an adequate amount of urine shall be regarded by the County as a refusal to take a test and the provisions regarding refusal to test shall be applied.

(ii)   **Applicants.** If the person being tested is an applicant, the County, at its sole discretion, may proceed as described above for an employee or may treat the inability to provide a sufficient quantity as a refusal to test resulting in the consequences specified in this Policy.

2.   Saliva. If an employee or applicant is unable to provide a saliva sample for an alcohol test, then the employee or applicant shall submit to an immediate breath or blood alcohol test, whichever the employee or applicant chooses. If the employee or applicant refuses to submit to the breath or blood alcohol test, the provisions regarding the refusal to test shall be applied.

3.   Breath. If an employee or applicant is unable to provide a breath sample for an alcohol test, the employee or applicant shall submit to an immediate blood alcohol test. If the employee/applicant refuses to submit to the blood alcohol test, then the County shall consider it a refusal to test; and the provisions regarding a refusal to test shall be applied.

## VII.   DUTY TO REPORT ARRESTS AND/OR CONVICTIONS

Any employee who is arrested and/or convicted for a drug or alcohol law violation occurring in or out of the workplace must notify the County's Drug

Created 11/9/2004                    36

Appendix 210

Program Coordinator within five days of the arrest and/or conviction. The County will review the facts giving rise to the arrest and/or conviction and any other pertinent information to determine whether this Policy has been violated. Neither the pendency of charges nor a not guilty finding shall preclude the County from making an independent judgment of whether there is substantial evidence that this Policy has been violated.

## VIII.  CONFIDENTIALITY OF DRUG TEST RESULTS

All drug and alcohol test results (positive or negative) will be reported to the County's Drug Free Program Coordinator. All records regarding whether and when a drug test was conducted and the results are confidential. They shall be maintained in secured files under the control of the Drug Free Program Coordinator. The test results will not be included in personnel files. Results will only be disclosed: (a) on a need to know basis, including, but not limited to the MRO and the Drug Free Program Coordinator; (b) with an individual's written authorization; (c) to the decision maker in a legal action initiated by or on behalf of the employee or placed at issue by the employee in any legal, administrative or other proceeding; or (d) as otherwise required by federal, state or local law. An employee shall have the right to see the results of his/her own drug test(s). Non-specific statistical data related to drug testing and rehabilitation and training records may be released to any governmental agency upon request.

## IX.   SEARCHES

When and if VENANGO COUNTY has reason to believe that an employee is violating any aspect of this Policy, the employee may be asked to submit immediately to a search or inspection. This includes a search of an employee's locker, desk, work station, County vehicles, or any other County property he/she uses or has access to. Entry onto the County's premises and continued employment with the County constitutes consent to search and inspection.

Created 11/9/2004

Appendix 211

7/6/2006

# SEXUAL HARASSMENT POLICY

It is the policy of Venango County to maintain a work environment in which every employee will be treated fairly, with consideration, dignity and respect. A vital element of this commitment is an environment free of any and all discriminating practices, including sexual harassment, whether it be verbal, physical or environmental. Thus, Venango County expressly prohibits sexual harassment in any manner or form. Venango County follows the EEOC definition of sexual harassment and its guidelines defining sexual harassment.

This policy applies to all employees, as well as applicants for employment. Each supervisor has a responsibility to maintain the work place free of any form of sexual harassment. All supervisors shall take appropriate action when matters of this kind are brought to their attention. No supervisor is to threaten or insinuate, either explicitly or implicitly, that an employee's refusal or willingness to submit to sexual advances will affect the employee's terms or conditions of employment.

All cases reported as suspected occurrences of sexual harassment will be thoroughly investigated in a confidential manner by the County. Where it is determined by Venango County that sexual harassment has occurred, Venango County will take immediate appropriate disciplinary action, which could result in suspension and/or discharge.

## DEFINITION OF SEXUAL HARASSMENT

Sexual harassment has been defined by the Equal Employment Opportunity Commission to be any unwanted, repeated, verbal or physical advances, sexually explicit derogatory statements, or sexually discriminatory remarks made by someone in the workplace which is offensive or objectionable to the recipient, or which causes the recipient discomfort or humiliation or which interferes with the recipient's job performance.

Sexual harassment includes unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when:
1. Submission to such conduct is made explicitly or implicitly a term or condition of an individual's employment;
2. Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting employment;
3. Such conduct has the purpose or effect of unreasonably interfering with the individual's work performance or creating an intimidating, offensive, or hostile work environment.

Other sexually harassing or offensive conduct in the work place, whether committed by supervisors, non-supervisory employees, or non-employees, is also prohibited. The following list is not exhaustive, but such conduct includes:

Created 11/9/2004                              38

Appendix 212

- Sexual flirtations, advances or propositions
- Verbal abuse of a sexual nature
- Graphic or suggestive comments about an individual's dress or body
- Sexually degrading words to describe an individual
- The display in the work place of sexually suggestive objects or pictures, including nude photographs
- Subtle pressure for sexual activity
- Unwanted touching, petting or pinching
- Demanding sexual favors accompanied by implied or overt threats concerning one's job, promotion, pay, etc.

The EEOC Guidelines on Sexual Harassment are attached hereto.

## RESPONSIBILITIES

Venango County has an obligation to ensure that the actions of its supervisors and employees are free from sexual harassment and will take prompt remedial and corrective action. Venango County also will take prompt action where any supervisory employee knows or reasonably should have known of the sexual harassment of any employee or applicant for employment.

All levels of management and supervisory employees are responsible for:

1. Assuring employees, affirmatively, that all forms of sexual harassment are prohibited by the County and that a thorough investigation of reported and/or suspected occurrences of sexual harassment will be conducted without any retaliation against complainants or witnesses.

2. Informing the Human Resources Director of all reported and/or suspected occurrences of sexual harassment.

3. Rejecting any offer or promise of sexual favors made by any employee or applicant for employment. Advising such employee or applicant for employment that such exchange violates the County's policy and applicable law and will not be tolerated.

## PROCEDURES

The following procedures shall be followed to ensure that this policy is known by all employees and that any offenses will be dealt with accordingly:

1. The Sexual Harassment Policy will be made known to all current employees and any newly hired employees.

2. Any sexual harassment or retaliation complaints shall be processed as follows:

Created 11/9/2004

7/6/2006

- A complaint must be reported, in confidence, to the direct attention of the employee's immediate supervisor. If the complaint involves the employee's supervisor or someone in the direct line of supervision, or if the employee for any reason is uncomfortable in dealing with his or her immediate supervisor, the employee may file the complaint directly to the Director of Human Resources who is also the County's Equal Employment Opportunity Officer. Immediate supervisors will report all complaints directly to the Human Resource Director within a 3-day period from the time the complaint is received who will monitor all steps within the investigation process.
- Complaints of acts of sexual harassment and retaliation will be accepted in writing or orally, and anonymous complaints will be taken seriously and investigated. A complaint need not be made by someone who was the target of harassment or retaliation. Anyone who has observed what he or she believes to be sexual harassment or retaliation should report it to his or her immediate supervisor.
- Employees and/or applicants must use the Sexual Harassment Complaint Form.
- The investigation process will be initiated within a 3-day period from the time the report is received by the Human Resources Director and all complaints will be thoroughly and fairly investigated. Investigations will attempt to protect the privacy of the individual and minimize suspicion toward all parties as much as possible.
- Substantiated reports of sexual harassment or retaliation will then be dealt with by the County with appropriate disciplinary action, including discharge.
- All matters relating to the complaint, such as meetings, monitoring, interviews, etc., will be documented but **kept as confidential as practical under the circumstances** and may be viewed only by the parties necessary to resolve the complaint.
- Any employee who engages in conduct determined to be sexual harassment, or encourages such conduct by others, shall be subject to disciplinary action including discharge.

## RETALIATION FOR SEXUAL HARASSMENT

The County prohibits any form of retaliation against any person by reason of such person's involvement in any capacity with sexual harassment complaints or the investigation of such complaints, including but not limited to unjustified discipline, changing of work assignments, providing inaccurate or incomplete

Created 11/9/2004

Appendix 214

work assignments with the intent to mislead, or refusing to cooperate or discuss work related matters.

## CONFIDENTIALITY

Only those who have an immediate need to know, including any person to whom a report of any violation of this policy is made, may be privy to the confidential complaint information. Any employee contacted during the investigation will be advised that unauthorized disclosure of information concerning the investigation will result in disciplinary action, including discharge.

## COOPERATION

An effective sexual harassment policy requires the support of management. Any employee who engages in sexual harassment or retaliation or who fails to cooperate with investigations of sexual harassment will be subject to disciplinary action, including discharge. Any employee, who refuses to implement remedial measures, obstructs or attempts to obstruct the remedial efforts of the County and/or retaliates against complainants or witnesses will be subject to disciplinary action, including discharge.

## DOCUMENTATION

Venango County will document all facts and circumstances related to any allegations of sexual harassment including, but not limited to, contents of meetings, interviews and results of investigations.

## PREVENTION AND EDUCATION

All Venango County employees will be required to review this policy. It will also be distributed and explained during the orientation process to new employees.

Periodic training sessions will be held for all employees and supervisors to increase their awareness of this County Policy, to update them on any changes in law, to discuss the reporting requirements and to define inappropriate conduct which would constitute sexual harassment. Attendance of such meetings shall be mandatory.

## X.    OTHER HARASSMENT

In addition to sexual harassment, the law prohibits harassment based upon a number of protected characteristics, such as race, color, creed, national origin, religion, and disability. The County does not tolerate harassment based upon any protected characteristic. Supervisors and employees can expect that other types of harassment will be handled in a manner similar to this policy.

Created 11/9/2004

41

Appendix  215

# E-MAIL AND COMPUTER USAGE

## A. Policy Statement

E-Mail and Internet access is considered by the County to be a important form of corporate communication. All communications within our intra-County computer network and sent or received through the Internet using County software and/or equipment, including the contents of an employee's computer, is the property of the County and should be for business purposes only (except, see I. Personal Usage). No person or employee-utilizing County purchased or developed software or using a County computer should have any expectation of privacy relating to such usage. All communications should be professional in nature. The use of these systems for, or obtain access to, defamatory, obscene, sexually explicit, illegal, offensive, threatening or other inappropriate communications is strictly prohibited. Improper use of the County's computer resources or network is grounds for discipline up to and including discharge.

## B. Monitoring and Control

The County retains the right to monitor all Internet usage and E-mail messages without notice to the user, sender or recipient of the message, except as restricted by applicable law.. This monitoring may, for example, take the form of utilizing specially designed software programs designed to permit a systems owner to ascertain how its system has been used and what sites have been accessed by individual users. For example, monitoring may be necessary to protect and ensure the system's security, to ensure that the employees are not using E-mail to communicate improper content, such as unlawful harassment, improper management techniques, unauthorized disclosure of confidential information and trade secrets, and to ensure that employees are not accessing improper sites or communicating to unauthorized recipients. The County will actively monitor Internet usage and E-mail communications, and reserve the right to inspect any and all files stored in private areas of our computer network in order to ensure compliance with policy.

## C. No Expectation of Privacy

Since all E-mail messages are the property of the County, we may monitor these communications to ensure that our system is being used for legitimate business purposes only, used in accordance with this policy, and/or to protect the County from liability. Employees and those communicating with employees must realize that they have no right or expectation of privacy in their E-mail or Internet communications when County equipment is involved. All messages are subject to review by management, and all communications are subject to scrutiny, except as restricted by applicable law.

# CELL PHONES AND PAGERS

It is the policy of the Prison to prohibit the carrying and usage of cell phones and pagers inside the Prison.

**Staff:**

Prison Staff are not permitted to bring cell phones or pagers onto Prison property without the written permission of the Warden or Chief Deputy Warden.

**Visitors:**

Any visitor or service provider who brings a cell phone or pager onto Prison property will be instructed to lock the cell phone or pager in a locker before they are allowed to proceed to the secure areas of the Prison.

Any exception to this policy shall be with the written approval of the Warden or Chief Deputy Warden.

# PUBLIC & MEDIA CONTACT

It is the policy of the Venango County Prison to maintain positive, informative relationships with the public, the media and other agencies with related functions, consistent with the security and privacy interests of the Prison, its staff and the inmates confined in its facilities.

The Warden, or his delegated spokesperson, will be the authorized spokesperson for any information needing to be related to the public or media, and will act as authorized under guidance and direction from the warden and/or County Commissioners.

Under no circumstances will any news media personnel have personal supervised or unsupervised face to face contact with the inmates of the Venango County Prison. This applies to news stories, etc, favorable or unfavorable or unrelated to the Prison. There is unhindered mail access to and from inmates and the news media.

Created 11/9/2004

43

# RELEASE OF INFORMATION

## POLICY
It is the policy of the Venango County Prison to ensure that all applicable provisions of federal, state and county privacy statutes or regulations are observed with respect to the records of inmates confined in the prison.

## PROCEDURES
Inmate central files will be maintained in a secure location and controlled in a way that ensures only those staff having a legitimate need to use those files have access to them. The files themselves and the cabinet in which they are stored will be marked "confidential."

<u>Releasable Information</u>
Ordinarily, the information that may be released about an inmate consists of those information elements that are already a part of the public record. The following inmate information is considered to be in the public domain:

Name, PIN number, date of birth, sex, race, date of commitment or release, parole eligibility date (if any), date sentenced, date sentence began, date of execution of warrant, FBI number, Fine(s)imposed, full-term expiration date, good-time allowance and rate (if any), inoperative time (if any), method of commitment or discharge, court docket number/offense, probation action, reason for any change of sentence, release destination, sentence procedure, sentence term, type and judge's name, special parole term (if any), time of commitment or release, time served, transfer destination (after the fact), and restrictions.
Release of other information contained in the inmate's Central file will be prohibited except for information required by employees and law enforcement agencies in the normal conduct of official activity, information for which the inmate has specifically authorized release, in advance and medical records maintained separately from the central file when needed for medical care and treatment.

Employees are specifically advised of the adverse consequences of unauthorized release of information, up to and including discharge.

# CONTROL ROOM OPERATIONS

## POLICY

It is the policy of the Venango County Prison to maintain secure Control Centers that serves as the Communications and movement control hub for the entire Prison.

The Control Centers are the hub of all external and internal security and communication activity. It will not ordinarily serve as a decision-making or command post, nor will weapons be stored there. The Warden or Deputy Warden will ensure that operations of the Control Centers be carried out in accordance with all applicable policies, procedures and regulations.

## PROCEDURE

An officer will be assigned to the Control Rooms around the clock or as designated by the Warden.

The Control Officer will remain in the Control Room with all doors securely locked.

All Officers must be familiar with admission and release procedures and all policies in the operating manual.

The Control Rooms will not be left unattended at any time. A relief officer will be assigned during break and lunch periods. The radio and telephone are to be answered promptly and courteously at all times.

Access to the Control Centers will be limited to those staff and contract employees who have official duties to conduct in this area. No one will be permitted to enter the Control Center unless the Control Center Officer is personally aware of their identify or can obtain positive verification of their identify and the purpose for which they are to be admitted. Access by non-Prison employees must be approved by the Warden or Deputy Warden.

When a disturbance occurs anywhere within the Prison, the Control Center ordinarily will be the first post notified. The Officer on duty there will immediately notify the Officer in Charge of the situation and then notify the Warden and if necessary, the Franklin Police Department and/or the Venango County Sheriffs Department.

The Control Center Officer will maintain logs and records of counts, alarms, visitors, key inventories, equipment inventories and equipment tests.

Created 11/9/2004

45

Appendix 219

# USE OF FORCE AND RESTRAINTS

**POLICY**

It is the policy of the Venango County Prison to provide its employees with proper training and guidance on the permissible use of force and to ensure that force is only used when necessary and only to the degree necessary to subdue an individual Inmate or restore order to a disruptive group. Deadly force may be used to prevent an escape, protect the public, or protect other lives when other available measures are insufficient for that purpose. The use of force, security equipment and restraint equipment is intended only as a control measure when absolutely necessary--these measures are not intended and will not be used as a means of punishment.

There is an essential area of judgment in the use of reasonable force by the Correctional Officer. Generally, however, use of force is justified in the following situations:

1.    To protect yourself or someone else
2.    To prevent inmate from hurting himself
3.    To prevent destruction of property
4.    To prevent escape
5.    To enforce the institutional rules and regulations

If at all possible, try to talk an inmate out of the cell rather than using force. If it becomes necessary to use force in either placing an inmate in or removing him from his cell, every effort should be made to have a supervisor present. If force cannot be avoided, the following should be observed:

1.    Try to determine if the inmate has a weapon before entering the cell.
2.    Use only enough controlling force to get the job done.
3.    If use of some sort of physical force appears to be necessary, the correctional officer must first carefully assess the situation in terms of factors, such as: How big, violent and powerful is the inmate? Is he armed? What is his mental state? If physical force then appears to have a reasonable prospect of success, an appropriate amount should be applied before the officer resorts to use of baton or body shield.
4.    Don't attempt to remove an inmate from a cell by yourself. At least two (2) correctional officers will be involved in the use of force.

Various methods (shield, mattress, etc.) May be used for removing an inmate from a cell. The officer should be familiar with any devices such as a shield that may be used in the removal process.

Appendix 220

7/6/2006

Various levels of forces follow:

**Pepper Mace**

Officers who have been trained in the use of Pepper Mace may use Pepper Mace to subdue an inmate who will not respond to verbal orders and can be used prior to an officer using physical force to get an inmate to comply to an order. An officer will not carry pepper Mace, unless there is a possibility for the application of the mace. The mace shall be kept in the control room at all times unless directed by the Officer in Charge to carry the mace, or the officer is entering the cell block to suppress a disturbance. After the use of Pepper Mace on an inmate, the inmate(s) will be allowed to clean themselves up after the situation is under control.

**Direct Contact Force**

The first level of force available to staff is the use of direct contact force. Physical handling is justified to subdue unruly Inmates; to separate participants in a fight; in self-defense; and in defending staff, Inmates, or other persons. It may also be used to move Inmates who fail to comply with lawful orders. As with any type of force the amount of force used in direct contact will be only as much as is needed to bring the Inmate to compliance with staff orders.

**Batons**

When the degree of force that can be applied by direct contact alone is inadequate, staff may exert additional force. Batons may be used to separate fighting Inmates or to quell other types of violence. Ordinarily, staff will not carry batons during the course of their duties. A supply of batons will be maintained in the Armory for issue on the authorization of the Shift Supervisor and/or Warden.

**Restraints**

The use of restraint equipment is intended to prevent escape, assault, or the commission of some other offense by violent or disruptive Inmates; to protect staff and Inmates and under circumstances, approved by the Warden. Line staff ordinarily will not carry restraint equipment.

Inmates in locked housing will be in restraints when moved out of their cells for any purpose; staff in those units may carry handcuffs, with appropriate controls on the handling of the cuff keys.

For Inmates in general population units, the use of restraints to control behavior is authorized only when all other reasonable methods have failed. An Inmate may be restrained to the restraint chair, only with the Warden or Deputy Warden's approval, when the inmate's behavior is so violent and dangerous to others when unrestrained as to constitute a serious risk to the institution's security and good order. In such cases, specific procedures require that the inmate is under constant supervision by a Corrections Officer

Created 11/9/2004

47

present in the same area; the restraints will be checked every 15 minutes; The Officer in Charge will determine when the Inmate has regained self-control and can safely be released.   An Inmate so restrained will be given the opportunity to be released from the restraints in order to eat and use the toilet. All incidents of this type will be immediately reported to the Warden and in no case will extend beyond (2) two hours without his approval.

**Electronic disabling devices will NOT be used in the prison.**

Training will be provided in necessary techniques for each of the devices employed, including techniques for use of hard and soft restraints, restraining Inmates to beds and other fixed objects, use of restraints for normal escort activity and for movement in locked units and reporting requirements for other uses of restraints.

### Chemical Agents

The Warden may authorize the use of chemical agents to control an Inmate or group of Inmates who otherwise cannot be controlled.  Chemical agents may be used to prevent serious injury or loss of life; to prevent or suppress riots or disturbances that may escalate in intensity and to prevent extensive, willful destruction of property.   These agents will be stored and controlled in accordance with established policy on use of chemical agents and weapons within the Prison.   If order can not be restored by less forceful methods, chemical agents may be deployed against either individuals or groups of Inmates-typically in the form of CN or CS gas, dispensed by aerosol, canister, projectile or engine-powered dispenser.

### Water Hoses

The use of water hoses may be authorized when lesser degrees of force have failed to bring an incident under control or when prompt use will prevent or discontinue a serious offense involving violence or bodily harm. The decision to use water will be made by the Prison Warden.

### Non-deadly Ammunition

Non-deadly ammunition such as rubber or wooden projectiles or "beanbags" are an additional option for controlling violent situations and may be used only with the Warden's approval.

### Deadly Force

Deadly force may be applied only to prevent an escape, protect the public or protect other lives.  This may include protecting property when there is a likelihood lives may be jeopardized (i.e., the need to shoot at an Inmate about to set fire to a building).  In an emergency situation in which it is not possible or practical to seek authorization, an employee will use appropriate force and later will be required to justify that action.

Appendix  222

7/6/2006

Firearms will not be issued except under the direction and order of the warden or Deputy Warden.

Firearms will be used ONLY in situations in which there is danger of death or grievous bodily harm and will not be discharged if less extreme measures will suffice, except in escape situations. An officer may fire under the following circumstances:

- At an Inmate or other person whom the officer has seen kill or seriously injure another person and who refuses to halt when ordered.
- At an escaping Inmate, if the escape is actually in progress and can not be reasonably prevented in a less forceful manner
- At an Inmate or other person carrying a weapon or attempting to obtain a weapon by force, if the officer has reason to believe that individual intends to cause death or serious injury.
- To protect property in cases such as arson, when the act is likely to cause serious injury or death.

**Verbal warnings must be used prior to the use of firearms.**

Staff members fired on by an Inmate or non-Inmate may return fire, taking into account the safety of noncombatants in the vicinity. Staff using deadly force will use all possible caution when in the proximity of civilians or when a fired shot may carry to an inhabited area. Only weapons-authorized staff may draw or be authorized to use firearms in the course of their duties. Each such staff member will be issued a weapons card specifying the weapons that the individual is qualified to use and be issued.

Reporting Requirements

The Prison Warden will be immediately notified when any type of force is used, including an accidental weapon discharge. A written report prepared by the officer involved will be completed no later than the conclusion of that shift and filed with the Prison Warden. The report will include the following:

- an account of the events leading to the use of force
- an accurate description of the incident and reasons for using force a description of the weapon or device used, if any, and the manner in which it was used description of the injuries suffered, if any and the treatment given or received; reports of all injuries will be filed in the Inmate's central file and the employee's personnel record.
- a list of all participants and witnesses to the incident
- a copy of all incident reports compiled as a result of the incident.

Created 11/9/2004

49

# FIRE PREVENTION, RESPONSE and EVACUATION

Applicability:
    This plan shall be applied any time there is a fire or other hazard present inside or outside of the Venango County Prison which necessitates the movement of inmates, staff, and/or civilians to areas of safety.

Purpose:
    This plan is to ensure the safe and orderly movement of inmates, staff, and civilians inside the Venango County from areas of danger to areas of safety during times of fire and/or other hazards encountered inside or outside the Venango County Prison.

Hazards:
    Fire is an danger that always concerns Prison Officials. In the Venango County Prison, it is unlikely that there would be much danger of actual fire damage. Most of the concern will be a byproduct of fire, smoke. Smoke and the toxic chemicals it contains are a danger to the inmates as well as the staff. The Prison has been designed with this in mind and separate ventilation systems were built to keep smoke from one block reaching another.

    Hazardous Materials Incidents are another danger that can cause the movement of inmates and staff for their safety. Franklin has three major traffic arteries passing through it. These highways have a considerable amount of truck traffic which carry many kinds of hazardous material. The City of Franklin also has hazardous materials stored in it. It is possible that a hazardous material incident could happen inside the City and pose a risk to the Venango County Prison. As stated in the preceding paragraph, the Prison is designed with separate ventilation systems which should keep any hazardous materials from entering the Venango County Prison.

    Few elements of the weather pose a greater risk than a tornado. The Venango County Prison should stand up well against a tornado or other strong wind situation.

Definitions:

    Deliberate Evacuation - An evacuation which precedes slowly and orderly, usually occurring during slowly developing situations.

    Hasty Evacuation - An evacuation conducted when it is imperative to remove people from the proximity of an imminent or existing life threatening situation.

Appendix 224

# Inmate Grievance

### Do not write in this Block

Grievance Number: 55-0516 _(Assigned by Prison Administration)_

Date Received: 16 MAY 05

Grievance Classification: (Assigned by O.I.C.)

☐ **Informal**          ☑ **Standard**          ☐ **Emergency**

---

Inmate's Name: Jennifer Fedorek          Date: 5/15/05

Date of Occurrence: 5/14/05

Incident or Complaint:

With an incident that occurred on 5/14/05 CO Craft used obscene language (CO mason to wit) and unnecessary force (CO mason, Stranther, Inmate Kizer to wit) on me. See also: Sheriff's report

Relief or Remedy Sought: I don't ever want to see her again. I wouldn't leave her alone, but as far as others going. I think she needs training on how to handle situations as a CO not a police officer and some time off w/o pay to think about what she done and to cool off wouldn't hurt.

By signing this form, you are stating that the information above is true and correct. You also understand that if the information is found to be false, you may be subject to disciplinary action.

Signed: _Jennifer Fedorek_

Initial Action Taken:

Given to Deputy Warden Sabowsky.

Sgt. McKenzie #12

---

C.O. DWrkee #57
Officer receiving grievance

Sgt. McKenzie #18
Officer in Charge

# Inmate Grievance Response

**Grievance Number:** _55-0516_

**Date Received:** _5-17-2005_

**Grievance Classification:**

☒ Informal          ☐ Standard          ☐ Emergency

**Grievance Response:**

☒ Step One          ☐ Step Two          ☐ Step Three

Inmate's Name: _FEDOREK JENNIFER_

Date of Occurrence: _05-14-2005_

Grievance: _OBSCENE LANGUAGE, UNNECESSARY FORCE_

Action Taken:

_The Chief Deputy Warden or the Warden will look into the entire incident. Any action that maybe taken will be the private concern of the Venanga County Prison and it's management._

If you are not satisfied with the action taken at Steps One or Two, you may appeal the decision. Step Three is with the Warden and his decision is final.

Grievance Committee:

_____

Date: _5-27-05_

_____

A Copy of the Original Grievance must be attached.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Name and address of Plaintiff:
Jennifer Ann Fedorek
Venango County Prison
Franklin Pa 16323

v.

Full name, title, and business address
of each defendant in this action:
1 Ronald Snyder, Warden
Venango County Prison
Franklin Pa 16323

2 Keoke Craft, C.O.
Venango County Prison
Franklin Pa 16323

Use additional sheets, if necessary
Number each defendant.

CA05-186E

**RECEIVED**

JUN 1 5 2005

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

ORIGINAL

Plaintiff brings this action against the above named and identified defendants on the following cause of action:

I.    Where are you now confined? Venango County Prison

What sentence are you serving? unknown

What court imposed the sentence? Venango County

II.   Previous Lawsuits

A.  Describe any and all lawsuits in which you are a plaintiff which deal with the same facts involved in this action. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

1.  Parties to this previous lawsuit

Plaintiffs _____

_____

Defendants _____

_____

2.  Court (if federal court, name the district; if state court, name the county) and docket number

_____

_____

RECEIVED TIME  FFR. 15.   4:09PM

3. Name of judge to whom case was assigned _____

4. Disposition (For example: Was the case dismissed? Was it appealed? Is it still pending?)
_____
_____

5. Approximate date of filing lawsuit _____

6. Approximate date of disposition _____

B. Prior disciplinary proceedings which deal with the same facts involved in this action:

Where?_____
When?_____
Result:_____
_____
_____

III. What federal law do you claim was violated? _____

8th & 14th Amendments

IV. Statement of Claim

(State here as briefly as possible the facts of your case. Do not give any legal arguments or cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Use as much space as you need. Attach extra sheet if necessary.)

A. Date of event: May 14, 2005

B. Place of event: Venango County Prison

C. Persons involved—name each person and tell what that person did to you:

1) Ronald Snyder, Warden - agreed upon the standards of my living situation & did not enforce any consistancy in the rules & regulations.

2) Kenre Craft, CB - used unnecessary force & created her own procedure in the prison.

— See Attachment

RECEIVED TIME FEB. 15. 4:09PM

I, Jennifer ____, ____, ____, filed ____ in the Venango County Prison. I was not given any reason for this. I have since been placed on medication for depression. I have endured many inconsistencies in procedure due to the segregation. I believe CO Keoke Craft used unnecessary force as a result of this. She escorted me to a visit on 5/14/05. She placed handcuffs on me which I'd never worn to visit from this segregated area. An argument pursued & I was told to discuss the matter with the OIC Doug Buchanan. On route to visitation, I ran into the OIC. I was discussing the inconsistency with Buchanan as Craft was shouting for me to enter the elevation. I was then returned to the segregation area which is located at the receiving desk of the Prison. Buchanan advised me to continue wearing the cuffs in exchange for my visit. It was agreed upon & I requested another CO take me to my visit. Buchanan denied my request. Craft & I then again proceeded to my visit. Upon entering the elevator, Craft began to argue with me. I told her not to speak with me. She continued shouting & yanking my cuffs. Craft radioed for backup. I endlessly shouted that I wasn't doing anything. CO Matt Mason arrived at the elevator. I was escorted back to the receiving desk. I told Craft not to touch me as she pinched the back of my arm. She threw me into the receiving desk & I repeated that I had done nothing wrong. I was placed in my cell with the cuffs still on. Craft denied my visit & said she'd remove the cuffs when she felt like it. C.O. Bill Struthers witnessed this & came to remove the cuffs along with Mason. Inmate Sheila Kizer witnessed both returns to my cell. Inmate Kizer, CO Struthers, & Mason clearly saw swelling & bruises on my wrists. Buchanan came to my cell & asked what happened as Struthers & Mason listened. The Venango County Sheriffs office was contacted. Deputy Oneil took pictures & statements. I was also granted a grievance on the following shift. I have since lost even more privileges. I am segregated where only males work yet have been instructed not to speak to me. The rules change to whatever & whenever they want them to. I believe that if there wasn't such inconsistency in rules that these turn of events would not have occurred. No other female has been segregated like I have nor been subject to this mistreatment.

Appendix  229

V.  Did the incident of which you complain occur in an institution or place of custody in this District? If so, where? Venango County Prison

and answer the following questions:

A.  Is there a prisoner grievance procedure in this institution?
Yes (X) No ( )

B.  Did you present the facts relating to your complaint in the state prisoner grievance procedure?
Yes (X) No ( )

C.  If your answer is YES,

1.  What steps did you take? I filled out an Inmate Request to file a grievance, received it & proceeded to file it.

2.  What was the result? I received a verbal & written grievance response indicating it would be looked into & any action taken is a private concern.

D.  If your answer is NO, explain why not: _____

E.  If there is no prison grievance procedure in the institution, did you complain to prison authorities?
Yes ( ) No ( )

F.  If your answer is YES,

1.  What steps did you take? _____

2.  What was the result? _____

VI.  Relief

State briefly exactly what you want the court to do for you. Make no legal arguments. Cite no cases or statues.

I would like to be compensated for malice & indifferent acts in a settlement in the amount of $160,000.00

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

6/11/05
(Date)

Jennifer Ann Harlow
(Signature of Plaintiff)

```
                    Perry Square Station
                      Erie, Pennsylvania
                         165011151
                      4125460004-0098
 06/15/2005           (814)453-6433        09:40:43 AM

                      Sales Receipt
  Product          Sale    Unit           Final
  Description      Qty     Price          Price

  Mail Pickup                 Delivered
  Label # 70050390000399390038
  # of Mail Pieces :   1
  Mail Pickup Date:06/15/2005    09:40 AM

  Total:                                   $0.00

  Paid by:

  BillN:  1000200343209
  Clerk:  01

  All sales final on stamps and postage.
  Refunds for guaranteed services only.
        Thank you for your business.
              Customer Copy
```

RECEIVED TIME  FEB. 15.   4:09PM